Charles O. WATSON, individually and trading as Watson Millwork Lumber Company, and S. S. Jaksick, individually and trading as White Pine Sales Company

v.

LEHIGH VALLEY WOOD WORK CORP., Inc. and Lloyds and Lloyds, Inc., and William R. Schmerling.

Civ. A. No. 23107.

United States District Court
E. D. Pennsylvania.

Oct. 23, 1961.

John T. Curtin, Philadelphia, Pa., for plaintiffs.

Arthur S. Lorch, A. Charles Peruto, Philadelphia, Pa., for defendants.

CLARY, Chief Judge.

This is an action based upon an alleged oral contract of guaranty, tried before this Court, without a jury. From the pleadings and proof, the Court makes the following

Findings of Fact

1. Plaintiff, Charles O. Watson, is a citizen of Nevada, engaged in the lumber business, trading as the Watson Millwork Lumber Company. Plaintiff, S. S. Jaksick, is a citizen of Nevada, trading as the White Pine Sales Company.

2. Defendant, Lehigh Valley Wood Work Corp., Inc., at the time the complaint in this action was filed, was a Pennsylvania corporation engaged in the wooden moulding and related products business. Defendant, Lloyds and Lloyds, Inc., is a Pennsylvania corporation engaged in the business of a del credere agent or factor. Defendant, William R. Schmerling, is a citizen of Pennsylvania, and a shareholder and director of Lloyds and Lloyds, Inc., as well as Lumico Sales Company.[1]

3. The amount in controversy exceeds $3,000 exclusive of interest and costs.

4. Lehigh was incorporated in February of 1956 and was adjudicated a bankrupt subsequent to the transactions here involved.

5. Lloyds financed Lehigh pursuant to a factoring agreement providing for a specified interest rate on the amount advanced plus a service charge of 1% on Lehigh transactions with suppliers and customers.

6. In the early part of May, 1956, Watson agreed to sell, and Lehigh agreed to buy certain amounts of lumber. Upon inquiry by Watson, a Mr. Wilkinson of Lehigh referred Watson to Lloyds for the guaranteeing of payment by Lehigh.

7. On June 19 and June 29, 1956, Watson wrote to Lloyds and requested a written guaranty of payment. These letters were never answered by Lloyds nor did Watson ever receive the written guaranty he requested.

8. Commencing on June 20, 1956, and ending on August 17, 1956, Watson shipped to Lehigh 19 cars of lumber for a total price of $68,512.62.

9. After Lehigh paid $39,588.66 of this debt, it defaulted. Thereafter, Lehigh was placed in bankruptcy and dissolved without any distribution to creditors, leaving a balance due to Watson of $29,216.12. Judgment by default was entered against Lehigh on September 9, 1957.

10. On July 17, 1956, Schmerling told Watson in a telephone conversation that he would forward a letter of guaranty. However, no such letter was forwarded to Watson.

11. On four separate checks remitted by Lehigh to Watson, Lehigh deducted 1%, a total of $192.69, from the invoices submitted and credited this amount to Lloyds on the face of the checks.

12. Lloyds thereafter received from Lehigh the 1% deducted.

13. Lehigh informed Watson that the 1% was being deducted as a commission for the guarantee of the accounts of Lloyds and was being paid to Lloyds. Lloyds, however, thought that Lehigh had persuaded Watson to absorb the 1% service charge which was to be paid by Lehigh to Lloyds under the factoring agreement.

14. Lloyds never received an additional 1% from Watson.

15. On August 22, 1956, at the request of Watson and for his accommodation, Lloyds transmitted a telegram to the Nevada Bank of Commerce in which Lloyds guaranteed payment of $16,000 covering invoices of Watson to Lehigh, so that Watson could secure a loan from a Nevada bank.

---

1. Hereinafter, Charles O. Watson will be referred to as "Watson", Lehigh Valley Wood Work Corp., Inc. as "Lehigh", Lloyds and Lloyds, Inc. as "Lloyds", and William R. Schmerling as "Schmerling".

16. On August 24, 1956, Watson, on the strength of the telegram from Lloyds, pledged and assigned to the Nevada bank, as collateral security, four Lehigh invoices outstanding, being Invoice Nos. 1357, 1358, 1359 and 1373, in a total amount of $20,335.21, to secure a loan to Watson in the amount of $16,100.

17. Lloyds was not informed and did not know specifically which invoices had been assigned to the bank.

18. On October 9, 1956, Lloyds mailed a certified check of Lehigh in the amount of $8,322.34 directly to the Nevada bank, and in the accompanying letter referred to another certified check in the amount of $9,381.73, which had been mailed previously, stating that the enclosed check and the previous check completed the guarantee of August 22, 1956.

19. Watson personally received the certified check in the amount of $9,381.73, which check was thereafter received by the Nevada bank and deposited in Watson's account.

20. The Nevada bank also received and deposited in Watson's account the certified check for $8,322.34 which it had received from Lloyds.

21. Thereafter, the Nevada bank reassigned the account of Lehigh back to Watson, and Watson pledged and assigned part of the account of Lehigh to White Pine Sales Company.

22. Schmerling did not agree with Watson on May 14, 1956, either individually or as an officer of either Lloyds or Lumico Sales Company, that he would guarantee payment by Lehigh.

23. Watson, without notice to any defendant, extended Lehigh's time for payment of its obligations to Watson.

## Conclusions of Law

1. This Court has jurisdiction over the subject matter of this action.

2. The validity of any contract entered into by the parties is controlled by the law of Pennsylvania.

3. The $16,000 guaranty given by Lloyds, whether or not enforceable, was satisfied with the certification of the two checks, and remittance to the Nevada bank.

4. No other contract of guaranty existed between the plaintiff and defendants guaranteeing payment of Lehigh invoices.

5. The defendants are entitled to judgment.

## Discussion

 Preliminarily it should be noted that the parties have stipulated on the record that the law of Pennsylvania is controlling here. It is well settled that the validity of a contract is determined by the law of the state in which it is executed. Linn v. Employers Reinsurance Corp., 1958, 392 Pa. 58, 139 A.2d 638. Watson alleges that Schmerling agreed to guarantee payment by Lehigh in a telephone conversation originating with Watson in Nevada and placed with Schmerling in Pennsylvania. Where an acceptance is to be given by telephone, the place of contracting is where the acceptor, or, in this instance, the alleged acceptor, speaks his acceptance. · Restatement, Conflict of Laws, Sec. 326, Comment (c).

Watson alleges that in a telephone conversation on May 14, 1956, Schmerling orally agreed to guarantee payment by Lehigh in return for a 1% commission. The correspondence offered into evidence by Watson, however, clearly indicates to this Court that such a conversation did not take place on the date alleged.

The first letter in the correspondence file of Watson is one dated June 19, 1956 written to Lloyds by Watson. It reads:

"Mr. Leonard Wilkinson of the Lehigh Valley Woodworks and Lynann Corporation, advised us that you would guarantee payment of accounts for lumber.

"We have on order six cars of lumber for these people, one car of which has already been shipped, and it will possibly average $2,500.00 per car. I would appreciate your prompt acknowledgment and advice concerning guaranteeing payment and their

financial responsibility in order that we may proceed with shipment of the orders we have on hand."

On July 13, 1956 Watson wrote to Schmerling as follows:

"Mr. Leonard Wilkinson, of the Lehigh Valley Woodworks Company advised us that you were factoring or financing their lumber inventory, and that you would guarantee payment of their account. We have shipped them five cars of lumber and have about 8 cars on order to ship.

"I would appreciate very much your advice concerning a letter guaranteeing payment of this account.

"Thank you for your prompt advice and such a letter of guarantee."

Neither of the above letters were ever acknowledged in writing nor did Watson ever receive the requested guaranty. The tenor of these two letters, along with Schmerling's emphatic denial that he ever talked to Watson on May 14, 1956, leads to the inescapable conclusion that no such conversation took place on that date. If Watson had received an oral guaranty from Schmerling on the date alleged, the subsequent letters set forth above would of necessity have been more confirmative in nature.

The contents of the following two letters, however, do indicate that on July 17, 1956, Schmerling did discuss with Watson the sending of a letter guaranteeing payment by Lehigh, but he never in fact sent such a letter.

The letter of July 17th reads as follows:

"Supplementing our letter of July 13th, and confirming our telephone discussion this morning with reference to your guaranteeing payment of the above captioned accounts, we have shipped and invoiced to the Lynann Corp. three cars of material which amounts to $9,231.40. We have shipped to Lehigh Valley Wood Works one car which amount to $2,-430.24. In addition, we have some

7 or 8 cars still on order for Lehigh Valley Wood Works.

"In order to serve our purpose and be of some assistance to us in handling this account, possibly the letter of guarantee would have to be made in the name of Lumico Sales Co., as your Company, for Lumico Sales Co. is rated in the Red Book which is what our Bank uses for credit reference in handling our accounts.

"You advised on the telephone today that you would put such a letter of credit in the mail and I sincerely trust that if you have not done so that you will do so promptly, and that the letter of credit will be in the name of Lumico Sales Company guaranteeing payment."

The following paragraph appeared in a letter from Watson to Schmerling dated August 9, 1956:

"I have written you several letters concerning a letter of guarantee but as yet have not received such a letter. The 1% we were to allow you was for guaranteeing the account, and of course, as you know the letter guaranteeing the account must be done in writing or by letter. Therefore, actually we have no guarantee until such time as we receive your letter so guaranteeing the account of Lehigh Valley Wood Works."

■■ The telephone conversation of July 17th, in view of the language employed in these two letters, cannot be considered a contract. Where an intention is manifested in any way, that legal obligations between parties shall be deferred until a writing is executed, preliminary negotiations and agreements do not constitute a contract. Nolan v. J. & M. Doyle Co., 1940, 338 Pa. 398, 13 A.2d 59. Therefore, Schmerling's preliminary agreement to mail a letter of guaranty did not create a binding obligation. Further, the language used by Watson in these letters indicates that he did not consider himself legally obligated to pay the one-percent (1%) guaranty until such time as he received the requested

guaranty from Schmerling. It should also be noted that Section 185 of the Restatement of Contracts provides that a promise to sign a written contract of guaranty must be in writing to satisfy the Statute of Frauds.

With respect to the telegram of August 22, 1956, Watson requested Schmerling to guarantee payment of Lehigh invoices so that he could obtain a loan from the Nevada bank in the amount of $16,100. Schmerling, in his capacity as an officer of Lloyds, forwarded the following telegram:

"Will guarantee payment of 16,000 Dollars covering invoices of Watson Millwork Company to Lehigh Valley Wood Works Corporation Allentown."

Watson did not advise Schmerling at that time which invoices he had assigned to the Nevada bank. Schmerling learned which invoices had been assigned when he received a copy of a letter from Watson addressed to Leonard Wilkinson of Lehigh on August 27, 1956, five days after Schmerling had sent the telegram. Undoubtedly, Lloyds did guarantee payment of $16,000. However, this obligation, whether or not legally binding, was satisfied upon the bank's receipt of the two certified checks.

■ Watson contends that Schmerling's alleged oral guaranty of May 14, 1956 was not within the Pennsylvania Statute of Frauds (33 P.S. § 3). He cites several cases where it has been held that the Statute of Frauds did not apply where the main purpose or object of one orally promising to pay another's debt was not to answer for the debtor, but to subserve some pecuniary or business purpose of the promisor, involving benefit to himself or damage to the other contracting party. Because Lloyds *allegedly* received a 1% commission from Watson, plaintiff argues that the guaranty served a pecuniary interest of Lloyds. These citations are clearly inapposite since Lloyds never received payment of the extra 1%.

■ Watson further contends that the telegram and the two checks taken together, can be considered as sufficient memoranda to satisfy the Statute of Frauds as to $16,000. This Court cannot agree. The telegram and the letter accompanying the two checks all referred to a guaranty of a limited amount, namely, $16,000. By seeing to it that Watson received more than this amount from Lehigh, no other conclusion can be reached but that this guaranty was made good. Moreover, even assuming that Lloyds breached its guaranty, there had been no showing that Lloyds received any consideration for the guaranty in the first instance. In effect the telegram said: "We will see to it that Lehigh pays Watson $16,000.00; if it does not, we will." Subsequently, Lehigh paid Watson over $17,000 thereby relieving Lloyds from any liability.

■ Still another reason would prevent Watson from recovering from Lloyds, assuming the truth of all plaintiff's allegations. Evidence was received which clearly showed that Watson agreed with Lehigh, without the knowledge of Lloyds, to extend the time of payment. 17 P.L.E., Guaranty, Sec. 8, provides in pertinent part:

"Similarly, in the absence of a provision in the contract of guaranty to the effect that the time for payment or performance may be extended without releasing the guarantor from liability, it is the general rule that an agreement between the guarantee and the principal for an extension of time for payment or performance by the principal releases the guarantor from the obligation of his guaranty, unless he consents to such extension, * * *"

■ Finally, it has been held that whenever a plaintiff seeks to make one liable for the debt of another, the case must be clearly proved and every ambiguity in the evidence weighed in favor of the defendant. Stouffer v. Jackson, 1910, 42 Pa.Super. 450. It is the opinion of this Court that plaintiff has failed to establish his allegations by a fair preponderance of the evidence.