In re OWNERS OF HARVEY OIL CENTER, George A. Farber, M.D. and Guy L. Leefe, Jr.

In re The FARLEE COMPANY.

In re ELK PLACE MEDICAL PLAZA, Bankrupts.

Bankruptcy Nos. 79-1150-A, 79-1150-B, 79-1151 and 79-1152.

United States Bankruptcy Court, E.D. Louisiana.

Dec. 27, 1982.

Gerald H. Schiff, Opelousas, La., for Mr. Sandoz, plaintiff.

Emile L. Turner, New Orleans, La., for Merchants Trust and Sav. Bank, defendant.

Jerry A. Brown, New Orleans, La., for intervenor Whitney Nat. Bank of New Orleans.

## OPINION

RODNEY BERNARD, Jr., Bankruptcy Judge.

This cause came on for hearing on June 9, 10 and 14, 1982 at Opelousas, Louisiana upon the complaint of the above-named bankrupts, who were debtors in possession under Chapter XII of the Bankruptcy Act at the time the complaint was filed. The complaint sought the turnover from Merchants Trust and Savings Bank and Century National Bank of numerous certificates of deposit owned by the above-named bankrupt entities that had been pledged to the defendant banks. Mr. William C. Sandoz was subsequently appointed trustee for all of the above-named bankrupts and was substituted as plaintiff in this proceeding. Whitney National Bank of New Orleans intervened as a party plaintiff. The claim against Century National Bank was dismissed prior to hearing.

### Statement of the Case

Harvey Oil Center (hereinafter "Harvey Oil") is a joint venture between Dr. George A. Farber and Mr. Guy L. Leefe, Jr. The Farlee Company (hereinafter "Farlee") is a partnership between the same two individuals, and Dr. Farber is its managing partner. Elk Place Medical Plaza (hereinafter "Elk Place") is a partnership in commendam, and Dr. Farber is its sole general partner. Mr. Leefe is not associated with Elk Place.

At various times between May and August, 1979, voluntary petitions under Chapter XII of the Bankruptcy Act were filed on behalf of Harvey Oil, naming Dr. Farber and Mr. Leefe individually, Farlee and Elk Place. (Harvey Oil, Farlee and Elk Place

will sometimes hereinafter be collectively referred to as "the bankrupt entities".) The petitions were filed in the Eastern District of Louisiana at New Orleans. Due to disqualification of both Bankruptcy Judges in the Eastern District, the undersigned Bankruptcy Judge was appointed by the Fifth Circuit Court of Appeals to conduct these proceedings. Chapter XII of the Bankruptcy Act, the chapter under which these proceedings were filed, applies to real property arrangements by persons other than corporations.

After the filing of the petitions, each of the bankrupt entities was continued as debtor in possession. Orders were entered authorizing each of the debtors in possession to operate its business. The orders authorizing the operation of business granted to the debtors in possession the power and authority to do a number of things incidental to the ordinary course of business, including the power:

> "(g) to collect and receive all rents, issues, incomes and profits, and all outstanding accounts, things in action and credits due or to become due to the within estate, and to hold and retain all monies thus received to the end that the same may be applied under this or different or further orders of this court . . . ."

Exhibits W–25, W–26, W–29, and W–31.

Substantial funds were generated in each of the estates. These funds were deposited in checking accounts at banks other than Merchants Savings and Trust Bank (hereinafter "Merchants"). At various times before the appointment of the trustee, Dr. Farber purchased certificates of deposit with a total value of approximately $269,000 from Merchants in the names of the bankrupt entities with funds generated from the operation of these entities. Dr. Farber pledged these certificates of deposit to Merchants as security for various loans to either Dr. Farber, personally, or to Golden Angel Farms, Inc. (hereinafter "Golden Angel"). Golden Angel is a corporation solely owned by Dr. Farber and is apparently in the business of breeding, selling and racing thoroughbred horses.

Upon discovering that the bankrupt entities' certificates of deposit had been pledged to Merchants, the attorney for the bankrupt entities began this proceeding to recover them. Shortly thereafter, Mr. Sandoz was appointed trustee and substituted as plaintiff in this proceeding.

*Findings of Fact and Conclusions of Law*

In May, 1979, William Arms, a Senior Vice President at Merchants, contacted Dr. Farber to discuss the possibility of Dr. Farber purchasing a membership in the $25,000 Club. The $25,000 Club is an organization associated with Merchants, and its purpose is to promote Merchants in the community. Merchants is located in Kenner, Louisiana, which is a suburb of New Orleans. The price of a membership is $25,000, if paid in installments, or $22,000, if paid in cash.

Dr. Farber agreed to purchase a membership in the $25,000 Club in the name of Golden Angel. In order to finance the membership, Dr. Farber applied for and received a $50,000 line of credit from Merchants in the name of Golden Angel. Pursuant to this line of credit, Golden Angel received $22,000, which it then used to purchase the $25,000 Club membership at the discounted price. Merchants claims this line of credit was to be secured by certain stock owned by Dr. Farber and valued at $65,000; however, the $22,000 was disbursed by Merchants before any stock was received as security. It appears that no stock was ever given to Merchants as security for the $50,000 line of credit.

In connection with Golden Angel's application for a $50,000 line of credit, Dr. Farber submitted to Merchants a personal financial statement prepared on May 1, 1979 and signed by Dr. Farber on May 14, 1979. The first filing of a petition in bankruptcy by one of the bankrupt entities occurred on May 15, 1979. Dr. Farber's financial statement makes no mention of bankruptcy or Chapter XII reorganization proceedings.

Prior to this transaction with Merchants, neither Dr. Farber nor any of the entities in which he holds an interest, including Golden Angel, Harvey Oil, Farlee and Elk Place,

had any dealings with Merchants. Dr. Farber was known to Mr. Arms and to James H. Queyrouze, Chairman of the Board and President of Merchants, only through his reputation as a physician and through their previous dealings with Dr. Farber's family several years earlier when Mr. Arms and Mr. Queyrouze were employed at another bank.

The first pledge of certificates of deposit purchased by and issued in the names of Harvey Oil, Farlee and Elk Place took place on November 2, 1979. Dr. Farber was attempting to obtain financing from a foreign source for the reorganization of the bankrupt entities. The foreign source required a $30,000 refundable deposit.

Merchants granted a loan in the amount of $30,000 to Dr. Farber, personally. Mr. Hooper, Senior Vice President and loan officer at Merchants, wrote the loan memorandum. The purpose of the loan as stated on the loan memorandum was for a commitment fee to First Funding Mortgage Corporation. Mr. Hooper approved the loan himself without seeking approval from Merchants' loan committee because he believed the loan would be fully secured by the pledge of certificates of deposit. The certificates of deposit pledged at this time were all purchased from Merchants by checks drawn on funds in accounts of the bankrupt entities at other banks.

The loan transaction took place on November 2, 1979 at approximately 7 p.m. at Merchants. Mr. Arms stayed late to handle the transaction. Dr. Farber and Mr. Leefe were unable to get to the bank during business hours on November 2 because they were involved in Bankruptcy Court proceedings the entire day. Merchants claims to be unaware that this is the reason Dr. Farber and Mr. Leefe requested to meet after business hours.

Because certificates of deposit owned by Harvey Oil and Farlee were to be pledged, Merchants required Mr. Leefe to attend the closing and sign a form entitled "Authority of Partnership to Open Deposit Account and to Procure Loans". The relevant portion of this form states:

> We have also agreed that any and all partnership property may be pledged, transferred or assigned, that money may be borrowed, liabilities incurred and promissory notes, [sic] signed and delivered by George A. Farber, M.D..

Ex. Mitchell # 1. This document, which Merchants claims is proper authorization for Dr. Farber to pledge property owned by Harvey Oil and Farlee, was signed by both Dr. Farber and Mr. Leefe on November 2, 1979. Merchants offered no documentary evidence purporting to prove Dr. Farber's authority to pledge the Elk Place certificate of deposit involved in this transaction.

Subsequent to the November 2, 1979 transaction, several more loans were made by Merchants to Dr. Farber, personally, or to Golden Angel.[1] In each case, Merchants accepted the pledge of certificates of deposit purchased at Merchants by the bankrupt entities and issued in their names as security for loans to Dr. Farber, personally, and to Golden Angel. Furthermore, in each case, the purpose of the loan was clearly not for the benefit of any of the bankrupt entities. The loan memoranda prepared by Merchants show that Merchants was aware of the purpose of each loan and the intended use of the funds by Dr. Farber.[2]

In connection with these transactions, Merchants did not seek proof of Dr. Farber's authority to pledge certificates of deposit owned by Harvey Oil and Farlee for his own, rather than partnership, purposes. Instead, Merchants assumed the document entitled "Authority of Partnership to Open Deposit Account and to Procure Loans,"

1. The dates of these loans are December 24, 1979; February 18, 1980; March 10, 1980; March 24, 1980; June 11, 1980; September 5, 1980; October 10, 1980; and March 20, 1981.

2. Examples of the purposes of these loans include:

1. The purchase of fairgrounds corporation stock. Ex. Arms # 8.
2. The purchase of thoroughbred horses. Ex. Arms # 11.
3. Operating capital for Golden Angel. Exhibits Arms # 14 and 15.

signed on November 2, 1979 by both Dr. Farber and Mr. Leefe, was continuing authority for Dr. Farber to pledge Harvey Oil and Farlee certificates of deposit for any purpose.

Merchants introduced into evidence a document purporting to authorize Golden Angel to pledge Elk Place certificates of deposit as security on loans to Golden Angel. This document is dated January 29, 1980 and is signed only by Dr. Farber as general partner on behalf of Elk Place. Ex. Mitchell # 2.

Merchants never requested nor received copies of the articles of partnership for Harvey Oil, Farlee or Elk Place in an attempt to determine whether Dr. Farber was authorized to pledge those entities' assets as he did. Merchants' officers did not believe this type of documentation was necessary. Merchants did not request an updated financial statement from Dr. Farber nor did Merchants run any credit checks prior to granting any of these loans. The officers of Merchants thought such precautions were unnecessary because they believed Merchants was fully secured by the pledge of certificates of deposit. Merchants never asked Dr. Farber about any involvement in bankruptcy. Further, Merchants never checked any legal publications to determine whether Dr. Farber or any of the entities whose certificates of deposit Dr. Farber was pledging were involved in bankruptcy. Such practice was not standard at Merchants.

Dr. Farber testified at length regarding conversations he had with various Merchants' officers both before and shortly after the November 2, 1979 transaction. He claims these conversations concerned the bankruptcy proceedings and foreclosure litigation against the bankrupt entities brought by Whitney National Bank of New Orleans (hereinafter "Whitney"). Merchants' officers flatly denied any conversations with Dr. Farber concerning bankruptcy. They further denied any ·knowledge from any source regarding the bankruptcies until May, 1981 when they were told there was a problem with the pledge of the certificates of deposit and asked to return them.

Merchants was aware, prior to the loan of November 2, 1979, that Dr. Farber was having difficulties with Whitney over its financing of entities in which he was involved. Shortly thereafter, Merchants became aware that Dr. Farber's problems with Whitney involved a foreclosure action by Whitney against an entity or entities whose certificates of deposit it had accepted in pledge on loans to Dr. Farber or Golden Angel. Merchants continued to accept the pledge of such certificates of deposit even after receipt of this information.

Given the detail of Dr. Farber's testimony regarding the dates, times and places of conversations concerning the bankruptcy proceedings, it is difficult to believe that Merchants did not know that the entities that owned the certificates of deposit were in bankruptcy at the time of the pledges. However, Dr. Farber's self-serving conduct in using partnership assets for personal purposes renders his credibility highly questionable. While the court finds it difficult to determine who was telling the truth, a finding of actual knowledge of the bankruptcies, or lack thereof, on the part of Merchants is unnecessary to a determination of whether Merchants must turn over the bankrupt entities' certificates of deposit to the trustee.

By pledging the bankrupt entities' certificates of deposit to Merchants, Dr. Farber clearly exceeded the authority granted to him in the court orders authorizing operation as a debtor in possession. Additionally, Dr. Farber did not obtain specific court approval to pledge the bankrupt entities' certificates of deposit. In the words of *Collier on Bankruptcy:*

> Authorization to operate the business does not in itself confer upon a trustee or debtor in possession unlimited scope of action in the operation. The extent of his authority depends on the terms of the order under Rule 12–22 and of any other pertinent orders. [Footnote omitted.] Parties dealing with the trustee or debtor in possession, whether in the operation of business or otherwise, act at their peril

and courts, as a rule, refuse to recognize contracts made by the trustee or debtor in possession outside the authority conferred upon him.

9 *Collier on Bankruptcy* ¶ 6.05, at 974 (14th ed.), citing *In re Avorn Dress Co., Inc.,* 78 F.2d 681 (2d Cir.1935), *amplified on rehearing* 79 F.2d 337 (2d Cir.1935). *E.g. In re Lafayette Radio Electronics Corp.,* 8 B.R. 528, 534 (Bkrcy.N.Y.1981). Accordingly, the court is of the opinion that the pledges of the bankrupt entities' certificates of deposit to Merchants are invalid because of Dr. Farber's lack of authority to pledge these assets.

■ Furthermore, the court will not retroactively validate Dr. Farber's pledges of the bankrupt entities' certificates of deposit. In making this decision, the court has followed the guidelines for determining whether the evidence supports equitable relief as outlined by the Second Circuit Court of Appeals in *In re American Cooler Co.,* 125 F.2d 496 (2d Cir.1942):

> We think that the judge should not retroactively validate the loan unless he is confident that he would have authorized it if a timely application had been made, and unless in addition, he is reasonably persuaded that the creditors have not been harmed by a continuation of the business made possible by the loan. He should also take into account, as bearing on the good faith of the debtor and lender, whether or not they honestly believed that they had authority to enter into the

transaction. Of necessity, each case must stand on its own facts, and these criteria cannot be mechanically applied; they should, however, materially facilitate the preparation of an intelligent record.

*Id.* at 497 (remanded for a determination of whether, under the above-discussed guidelines, an unauthorized loan to a corporate debtor by a lender that had knowledge of the bankruptcy should be granted retroactive validity).[3] The Second Circuit in *American Cooler* further emphasized that the court's equitable power must be cautiously exercised. *Id.*

In the matter presented today, the court is not confident that it would have authorized the pledge of the bankrupt entities' certificates of deposit as security on the November 2, 1979 loan to Dr. Farber even though the funds were to be used to attempt to obtain permanent financing for the bankrupt entities. The court is without doubt that it would not have authorized any of the subsequent pledges of the bankrupt entities' certificates of deposit to secure loans to Dr. Farber and Golden Angel for the personal purposes of Dr. Farber. Furthermore, validation of any of these pledges would substantially harm the unsecured creditors of the bankrupt entities.

■ Merchants has made the equitable plea that it should be allowed to retain all of the pledged certificates of deposit on the grounds that it lacked actual knowledge or notice of the bankruptcy proceedings and that it acted in good faith.[4] Assuming that

---

3. None of the cases known to this court that deal with unauthorized acts of a receiver, trustee, or debtor in possession involve a third party *without* knowledge that the party with whom he is dealing is in bankruptcy and subject to court control.

4. Merchants' reliance on *Bank of Marin v. England,* 385 U.S. 99, 87 S.Ct. 274, 17 L.Ed.2d 197 (1966), for this proposition is misplaced. *Bank of Marin* was later codified in 11 U.S.C. § 542(c) as follows:

> Except as provided in Section 362(a)(7) of this title, an entity that has neither actual notice nor actual knowledge of the commencement of the case concerning the debtor may transfer property of the estate, or pay a debt owing to the debtor, in good faith and other than in the manner specified in subsec-

tion (d) of this section, to an entity other than the trustee, with the same effect as to the entity making such transfer or payment as if the case under this title concerning the debtor had not been commenced.

The legislative history of Section 542(c) indicates that the protection afforded by this section applies only to a transferor or payor and not to a transferee or payee receiving a transfer or payment. 124 Cong.Rec. H 11,097 (Sept. 28, 1978); S 17,412 (Oct. 6, 1978). *Bank of Marin* involved, and 11 U.S.C. § 542(c) especially contemplates, the situation that arises when a drawee bank pays checks drawn on its depositor's account when such payment is made after a petition in bankruptcy has been filed but before the bank receives notice or knowledge that its depositor is in bankruptcy. The party receiving payment is not protected by this. By

Merchants was without actual knowledge or notice of the bankruptcy proceedings, this court is of the opinion that Merchants would have a valid claim to the certificates of deposit if it had acted entirely in good faith in accepting them in pledge.[5] To deny Merchants retroactive validity of the pledges under these circumstances would appear to be a denial of its due process rights. These circumstances, however, do not exist.

Good faith entails honesty of intention as well as lack of knowledge of any circumstances that should put the holder on inquiry. Merchants lack of good faith is evident from a number of factors. First, before each pledge of the bankrupt entities' certificates of deposit, Merchants' officers were sufficiently apprised of circumstances that should have caused them concern and compelled them to inquire further before granting the loans and assuming the validity of Dr. Farber's pledges.

Before approving the $30,000 loan to Dr. Farber on November 2, 1979, Mr. Hooper knew that the purpose of the loan was for a refundable deposit to be used to obtain refinancing on Elk Place, which had already been permanently financed by Whitney. Dr. Farber informed Mr. Hooper that he wanted the loan removed from Whitney because Whitney had reneged on a commitment to him and, further, that he was filing suit against Whitney. Mr. Hooper approved this loan without asking for more detail concerning these suspicious circumstances, without checking outside sources for further information and without taking the loan application to Merchants' loan committee for further review.

When Mr. Queyrouze was told that Dr. Farber was suing Whitney, he became concerned and requested a meeting with Dr. Farber to learn more about the litigation.

Mr. Queyrouze could not determine the date of this meeting because he disposes of his appointment calendars at the end of each year. Dr. Farber's calendar indicates, and the court accepts these dates as correct, that he met with Mr. Queyrouze at least once in January, 1980 and again in April, 1980 to discuss the foreclosure by Whitney and the Chapter XII proceedings. Mr. Queyrouze admits that Dr. Farber informed him that Whitney had foreclosed on certain property. As stated earlier, Mr. Queyrouze was aware that this property was owned by an entity or entities whose certificates of deposit Merchants had accepted in pledge. Mr. Queyrouze testified that Dr. Farber claimed the seizure of property was wrongful and that he was suing Whitney for several million dollars. Mr. Queyrouze stated that he did not investigate the matter further because he was satisfied with the information Dr. Farber had given him. Merchants continued to accept certificates of deposit knowing, at the very least, that the owners of the certificates of deposit were being foreclosed upon.

The information Merchants admits having known is sufficient to have put it on inquiry notice. A bank is expected to have a certain level of expertise with respect to financial matters. It is quite common for a foreclosure to be preceded, or followed shortly thereafter, by bankruptcy. With a minimum amount of effort, Merchants could have and should have discovered the bankruptcies through outside sources. Merchants, instead, chose to close its eyes to the situation relying on the false assumption that it was fully secured by the pledge of certificates of deposit.

■ Second, Merchants failed to determine, under applicable state law principles, Dr. Farber's authority to pledge certificates of deposit owned by Harvey Oil, Farlee and

---

accepting the pledges of certificates of deposit, Merchants was receiving a transfer. It was not a transferor of property of the estate and, thus, is not protected by the rule of *Bank of Marin.*

**5.** *Cf.* Section 70d(1) of the Bankruptcy Act. Section 70d(1) validates transfers of any property of the bankrupt, other than real estate, made after bankruptcy and either before adjudication or before a receiver takes possession

of the bankrupt's property, provided the transferee acted in good faith without knowledge of the bankruptcy and gave present equivalent value. Section 70d(1), however, is not directly applicable to a debtor in possession under Chapter XII of the Bankruptcy Act. *Accord In re Texlon Corp.,* 596 F.2d 1092, 1096–97 (2d Cir.1979).

Elk Place. The Louisiana Civil Code, in effect at the time of the pledges and the time of filing of the petitions in bankruptcy, provides as follows:

A partner can not for his own concerns, give in pledge the partnership property without the consent of his associates. He can not do it even for the partnership concerns, without such consent, unless he be vested with the management of the copartnership.

Louisiana Civil Code Ann. art. 3151 (West). Furthermore, it is the duty and at the risk of the party dealing with a partner apparently exceeding his authority and acting for himself to require evidence of that partner's special authority to bind his copartners. *Victoria Lumber Co. v. Montgomery,* 130 La. 120, 57 So. 650 (1912); *Allen v. Cary,* 33 La.Ann. 1455 (1881).

Merchants never requested or obtained copies of the articles of partnership for Harvey Oil, Farlee or Elk Place in an attempt to verify or ascertain the extent of Dr. Farber's authority to act on behalf of any of these entities. Further, Joseph J. Schilleci, Jr., Vice President and loan officer at Merchants who took over Dr. Farber's accounts in June, 1980, testified that he had "no inkling at all about his [Dr. Farber's] integrity and whether or not he had the authority to sign these documents". Tr. at 561–62. Mr. Schilleci apparently did nothing to determine Dr. Farber's integrity or authority to make pledges before accepting the pledges of the bankrupt entities' certificates of deposit.

Merchants' only documentary proof of Dr. Farber's authority to pledge partnership assets as he did is totally inadequate and would not protect Merchants even if no bankruptcies had been filed. The document entitled "Authority of Partnership to Open Deposit Account and to Procure Loans", dated November 2, 1979 and signed by Dr. Farber and Mr. Leefe, may have been adequate proof of Dr. Farber's authority under state law to pledge Harvey Oil and Farlee assets for the loan granted November 2, 1979; but it certainly is not proof of Dr. Farber's authority to pledge these entities'

assets as security for subsequent loans to Dr. Farber and Golden Angel for Dr. Farber's personal purposes. While this document does not specify the purposes for which Dr. Farber was authorized to pledge Harvey Oil and Farlee assets, Merchants was in error in assuming the authority granted under this document extended to any purpose beyond partnership concerns. It is clear that special authority is necessary to validate a partner's pledge of partnership assets for nonpartnership purposes. Merchants undoubtedly knew that Dr. Farber intended to use the loan funds for his own purposes and, thus, should have required special proof of Dr. Farber's authority to pledge partnership assets for personal purposes.

The document signed by Dr. Farber as general partner on behalf of Elk Place, dated January 29, 1980, purporting to give Dr. Farber authority to pledge an Elk Place certificate of deposit as security on a loan to Golden Angel lacks validity because it is signed only by Dr. Farber. Dr. Farber alone could not grant himself authority to use partnership assets for personal purposes. This rule holds true even though Elk Place is a partnership in commendam and Dr. Farber its sole general partner. The consent of Dr. Farber's partner(s) was necessary to authorize him to use Elk Place assets for personal purposes. Merchants failed to obtain proof of such consent.

Another example of Merchants' failure to follow proper procedure with regard to the pledge of the bankrupt entities' certificates of deposit is shown by two of only three collateral pledge agreements that were entered into evidence. One collateral pledge agreement is dated February 18, 1980. Ex. Arms # 16. This document purports to be a pledge of a Harvey Oil certificate of deposit to secure the indebtedness of Golden Angel and is signed by Dr. Farber in his capacity as president of Golden Angel. The other collateral pledge agreement is dated March 24, 1980. Ex. Arms # 17. This document purports to be a pledge of a certificate of deposit jointly owned by Harvey Oil and Farlee. It, too, is signed by Dr. Farber for Golden Angel. The obvious problem with these pledge agreements is

that Golden Angel, the pledgor, was never given any authority to pledge Harvey Oil or Farlee assets. The document entitled "Authority of Partnership to Open Deposit Account and to Procure Loans" only purported to give "George A. Farber, M.D." authority; and, as discussed in the immediately preceding paragraphs, that authority was limited.

Merchants offered the testimony of William D. Mitchell, Field Officer Supervisor for the Federal Deposit Insurance Corporation, as an expert witness in the field of banking. As a bank examiner, Mr. Mitchell is involved in reviewing banks' documentation of loans to determine the validity of the loan and security instruments and the level of risk involved with the loans. Mr. Mitchell's testimony with regard to proper loan documentation was given little weight by the court due to his tendency to agree with whoever was questioning him. Additionally, Mr. Mitchell admitted that bank examiners give banks a "little leeway" when their loan documentation is not entirely complete or valid in situations "that probably will not make any difference". Tr. at 516. As hindsight shows, this is one of those situations when failure to properly document a transaction truly makes a difference.

Finally, in determining Dr. Farber's creditworthiness, Merchants' officers failed to undertake certain simple steps that may have led Merchants to information regarding the bankruptcies. Merchants' officers did not request an updated financial statement from Dr. Farber. Merchants' officers did not ask Dr. Farber if he was involved in any bankruptcies, nor did they run any credit checks on Dr. Farber or the entities in which he was involved subsequent to the initial transaction with Dr. Farber. Additionally, Merchants never checked any legal publications to determine whether Dr. Farber was involved in any bankruptcies even though such procedure is standard practice at various other banks in the area.

Merchants obviously dispensed with many precautions in reliance upon Dr. Farber's presumed good character. In fact, Mr. Hooper stated that the character of the individual was the most important factor in extending credit. The bankrupt entities' creditors should not have to bear the burden of Merchants' faulty judgment regarding Dr. Farber's character.

In determining that Merchants did not act in good faith in accepting the pledges of certificates of deposit owned by the bankrupt entities, the court has considered the totality of the circumstances surrounding Merchants' transactions with Dr. Farber. The opinion of the court today should be restricted to the facts and circumstances of this case.

The invalidation of the pledges of the bankrupt entities' certificates of deposit does not leave Merchants without a remedy. Its remedy is to seek recovery from Dr. Farber and Golden Angel, the parties who borrowed the funds and pledged certificates of deposit without authority.

Due to the invalidity of the pledges of certificates of deposit owned by Harvey Oil, Farlee and Elk Place to Merchants by Dr. Farber, and the court's finding that retroactive validation of these pledges is improper, a separate judgment in favor of the plaintiff and intervenor is being rendered this date in accordance with the foregoing.