### In re CITY WIDE PRESS, INC. Debtor.

### Bankruptcy No. 88–13361S.

United States Bankruptcy Court, E.D. Pennsylvania.

July 21, 1989.

Michael A. Temin, Philadelphia, Pa., for trustee.

Edward C. Toole, Jr., Mary F. Walrath, Philadelphia, Pa., for Communicraft, Inc.

James J. O'Connell, Philadelphia, Pa., Asst. U.S. Trustee.

Albert A. Ciardi, Jr., Aris J. Karalis, Philadelphia, Pa., for debtor.

James W. Adelman, Philadelphia, Pa., for Creditors' Committee.

Rosetta B. Packer, Philadelphia, Pa., for Fidelity Bank.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION.

The instant motion of Communicraft, Inc. (hereinafter "CC") to lift the automatic stay to allow it to enforce its purported security interest in funds held by the Trustee and to sequester funds held by the Trustee which are allegedly its cash collateral ultimately turns upon whether this court should grant CC a super-priority security interest priming that of all other secured parties, pursuant to 11 U.S.C. § 364(d), *nunc pro tunc.* We hold that the § 364(d) *nunc pro tunc* relief sought is confined to extraordinary circumstances where there is at least a clear agreement between the debtor and the lender upon which both have acted. Meanwhile, here we find that the credit agreement between the Debtor and CC, at least at all times subsequent to January 9, 1989, did not have the requisite precision of terms and intended formality to constitute an enforceable contract even between these parties. Further finding that CC has been paid sufficient funds to satisfy its security interest through January 9, 1989, we are constrained to hold that CC did not have any security interest after that date which could support the relief sought.

We also reject CC's contention that the automatic stay expired pursuant to the terms of 11 U.S.C. § 362(e) and Bankruptcy Rule (hereinafter "B. Rule") 4001(a)(2), because CC's ultimate agreement that the final hearing be continued until June 21, 1989, and briefed thereafter, waived the time periods set forth therein, at least through the date of this decision. Therefore, we deny CC's motion.

### B. PROCEDURAL HISTORY/FACTS.

This case was commenced by the filing of an involuntary Chapter 7 petition against the Debtor on September 27, 1988. On October 13, 1988, the Debtor filed a voluntary Chapter 11 proceeding, at Bankr. No. 88–13595F. That case was consolidated before this court with this case, and this case thereafter proceeded as a Chapter 11 matter in which an order for relief was entered by agreement. As of September 27, 1988, the Debtor was no longer doing business and had lost its line of credit with Fidelity Bank, National Association (hereinafter "the Bank"). However, it did have certain open printing contracts, one of which was a large government contract that was believed would be profitable if completed.

Consequently, the Debtor, the Bank, and CC executed a Stipulation whereby the

Debtor was authorized to enter into a Services Agreement with CC pursuant to which CC would advance the Debtor's costs of operation and obtain a management fee and a first lien priming the Bank on accounts generated under the Services Agreement, pursuant to 11 U.S.C. § 364(d). The Stipulation was approved by this court on November 10, 1988, after notice and a colloquy attended by counsel for the Debtor, the Bank, and the Official Unsecured Creditors' Committee (hereinafter "the Committee"), at which no opposition thereto was raised. However, it included a provision reciting that "[t]he Services Agreement shall be effective only for a period of sixty (60) days...."

Unfortunately, although the Debtor's counsel prepared a proposed draft of the Services Agreement and the Debtor and CC immediately began operations under the terms of the Stipulation, the parties never agreed on wording and no Services Agreement was ever executed. The parties nevertheless continued such operations through February 10, 1989, thirty-one (31) days after the 60-day period contemplated in the Stipulation. On that date, a dispute arose and the Debtor ordered CC off the premises. In response, CC obtained counsel for apparently the first time in these proceedings and filed the instant motion on February 16, 1989. Expedited consideration was granted, and a hearing was commenced on March 1, 1989.

In the course of that hearing, the Bank made it known that it intended to foreclose upon its interest against the Debtor, which would terminate its operations. The Committee then proposed that the contracts on which work was in progress be salvaged by appointing a Trustee to oversee the Debtor's operations and retain all proceeds earned by it. All parties ultimately agreed to this suggestion, with the added proviso that the Debtor's accountant, Steven J. Comer (hereinafter "Comer"), in whom all parties expressed confidence, would promptly prepare a report which would be the basis of a determination of the rights of CC in the sums to be held by the Trustee. This motion was therefore continued until March 29, 1989, at which time it was believed that information necessary to make this determination would be available.

Although Comer completed his report in timely fashion, there was apparently a hope that the issue of the amount to which CC was entitled could be resolved amicably when all of the Debtor's work was completed. Therefore, CC agreed to continue the hearing on this motion until April 19, 1989, and again until May 3, 1989. On the latter date, in partial response to the court's increasing reluctance to perpetuate continuances, counsel for all interested parties, including CC, proposed our establishing a claims bar date on June 16, 1989, shortly after all of the Debtor's contracts were completed. It was contemplated that our so doing would allow the Trustee to have before him the entire universe of claims in determining the rights of all parties, including CC, to the proceeds in his hands. It was believed that allowing this procedure to unfold could render the matters in dispute moot. As a result, the hearing was continued again until May 17, 1989.

On the latter date, it readily became apparent that the period of consensus which had reigned over the past two months was over. CC took the position that its rights as a secured creditor under 11 U.S.C. § 364(d) extended to all cost incurred by it through the date that it was forced off the job on February 10, 1989. All of the other parties, including the Trustee, took the position that CC's rights under § 364(d) extended no farther than to costs and expenditures advanced by CC through January 10, 1989.

Thus, the hearing on this motion, which had begun on March 1, 1989, was resumed on May 17, 1989. After considerable testimony was adduced, we questioned the sudden desire of CC to compel us to render a decision as to its rights prior to the claims bar date and indicated our likely inability to decide the matter without further briefing and a delay until about the time of the bar date in any event. After an extended colloquy in which it initially expressed a desire to proceed immediately, CC ultimately agreed to continue the hearing on its mo-

tion until June 21, 1989. On our part, we indicated a desire to solicit briefs prior to June 21, 1989, in order to assist us in our rendering the prompt disposition that CC desired in the event that the parties' differences were not resolved.

Upon advice from CC that the matter was not resolved as of June 9, 1989, we entered an Order of June 12, 1989, requesting all interested parties to file Briefs expressing their respective positions as to CC's motion on or before June 20, 1989. The final segment of the hearing was then concluded on June 21, 1989. Becoming aware of the decision that day in *In re Wedgewood Realty Group, Inc.*, 878 F.2d 693 (3d Cir.1989), we had our Law Clerk contact CC's counsel and give her the option of our rendering a brief decision on or before the court departed on June 26, 1989, for an extended vacation, or giving CC an opportunity to submit a supplemental Brief during our vacation, in which case we would extend the duration of the stay until thirty (30) days after this submission. CC's counsel opted to make an additional submission to us, and we thereupon entered an Order of June 23, 1989, allowing any interested party to file supplementary submissions on or before July 14, 1989, and directing that the stay remain in effect until August 14, 1989. The Trustee filed a one-page supplemental Memorandum of Law, in which the Debtor joined. CC filed a seven-page Memorandum of Law and 17 pages of detailed Proposed Findings of Fact and Conclusions of Law with page references to Transcripts of the hearing dates, which CC had prepared and filed. These submissions, filed on July 14, 1989, though not solicited in such detail, were helpful to the court in resolving this matter expeditiously.

The Trustee's position, echoed by the Debtor and the Committee (and the Bank), applies Comer's apparently mutually-acceptable report to its contention that CC's security interest under § 364(d) extended only to expenses incurred through January 10, 1989. The report states that, according

to CC, it paid $274,710.99 and justifiably expended $481,873.76, and thus incurred total costs of $756,584.85 over the entire duration of its relationship with the Debtor. Without resolving the dispute between them, the report further states that the Debtor contended that CC's payments were only $237,646.44 and its justifiable expenditures only $431,583.76, or a total amount of costs incurred of $669,220.20. The statement in the report that CC had been paid $469,730.01, plus a payment of $40,000 by the Trustee, thus establishing total payments to CC of $509,730.01, is undisputed. The report then lists "Items Incurred After January 10, 1989" by CC at a total of $292,383. The Trustee is holding approximately $285,000. The Trustee contends that CC had a super-priority interest under § 364(d) as to no more than $464,201.75.[1] This figure which CC has been paid is more than this figure. Therefore, the Trustee declined turning over any additional sums to CC and contended that CC is entitled to only a pro rata distribution with other administrative claimants as to its post-January 10, 1989, advances.

The principal contention of CC is that we should grant it a security interest pursuant to § 364(d) as to those advances made after January 10, 1989 *nunc pro tunc*, under the principles enunciated in, *e.g.*, *In re American Cooler Co.*, 125 F.2d 496, 497 (2d Cir. 1942). *See also, e.g.*, 2 COLLIER ON BANKRUPTCY, ¶ 364.03, at 364–8 to 364–9 (15th ed.1989). However, before analyzing that contention, we briefly note and dispose of two other arguments made by CC.

## C. CC IS CLEARLY NOT ENTITLED TO RELIEF UNDER THE TERMS OF 11 U.S.C. § 362(e) AND B. RULE 4001(a)(2).

First, in its Supplemental Memorandum, CC argues that, at some unspecified date presumably prior to the present, the automatic stay terminated as to it by operation of law pursuant to 11 U.S.C. § 362(e),

---

1. $756,584.85 (CC's payment and expense total) less $292,383 (items incurred after January 10, 1989) equals $464,201.75. Under the Debtor's

figures, CC's total secured claim would be only $376,837.10.

on the authority of *Wedgewood, supra.* We cannot agree. The Court of Appeals, in *Wedgewood,* states that the provisions of § 362(e) and B. Rule 4001(a)(2) may be waived by the movant's taking "some action which is inherently inconsistent with adherence to the time constraints" of § 362(e) and B. Rule 4001(a)(2), including, as examples, instances where the movant agreed to a continuance of the final hearing or delayed the court's disposition by requesting an opportunity to make post-hearing submissions. *Wedgewood, supra,* 878 F.2d at 701–02. We have set forth the procedural history of this case and this motion in some detail to indicate that CC clearly and unequivocally agreed to continue the final hearing until May 17, 1989. Moreover, on that date, CC ultimately agreed to continue the hearing once again until June 21, 1989, after the claims bar date had passed and the Debtor's work in progress was entirely completed. Considerable additional testimony was adduced on June 21, 1989. As a result, the final hearing was not completed, by ultimate agreement of CC, until June 21, 1989.[2] Therefore, by the terms of B. Rule 4001(a)(2), the stay could not terminate, by effect of § 362(e), until at least July 21, 1989.

However, subsequent to the June 21, 1989, hearing, CC requested an additional period to make supplemental submissions to the court. Twenty-six (26) pages of supplemental materials arrived on July 14, 1989. *Compare Wedgewood, supra,* 878 F.2d at 698–702 (movant submitted only copies of exhibits and a three-page letter citing two cases and no proposed findings of fact after the final hearing). In light of *Wedgewood,* we expressly extended the stay until August 14, 1989, by our Order of June 23, 1989. That Order was entered solely to accommodate CC's request to make additional submissions and was not appealed by it. We hold that the extension of the stay granted in that Order is valid. In any event, the instant decision has been rendered prior to July 21, 1989, foreclosing the potential of termination of the stay under the terms of B. Rule 4001(a)(2). *Compare Wedgewood, supra,* 878 F.2d at 699 (court holds that stay terminated no earlier than 30 days after conclusion of the final hearing even upon the failure of the bankruptcy court to expressly extend the stay). We therefore conclude that the *Wedgewood* decision does not further CC's cause, and the stay has not expired by effect of § 362(e) and B. Rule 4001(a)(2).

D. THE RECORD DOES NOT JUSTIFY REJECTION OF COMER'S REPORT THAT $292,383, AND NOT SOME LESSER AMOUNT, OF COSTS WERE INCURRED BY CC AFTER JANUARY 10, 1989.

Secondly, CC urges us to reject the express and unequivocal statement in Comer's report, that the costs incurred by CC after January 10, 1989, amounted to $292,-383, and find that only about $100,000 in expenses were incurred by it after January 10, 1989. In our Order of June 23, 1989, we expressly urged CC to clarify a contention made by it at the close of the June 21, 1989, hearing that it was entitled to relief even if it had no security interest after January 10, 1989. However, the only support for this conclusion cited in these submissions is reference to testimony of Ross Feehrer, CC's President, on cross-examination by the Trustee's counsel, in which Feehrer stated that "approximately $100,-000 ...primarily in labor" were the only

---

**2.** We take issue with the statement in CC's Supplemental Memorandum that on May 17, 1989, the court ignored CC's arguments under § 362(e) "and expressly stated that it would not render a decision within the time required by the Code and Rules." Had CC persisted in urging that the hearing be completed on May 17, 1989, we would have done so. Under B. Rule 4001(a)(2), we would have had until June 16, 1989, to render a decision on the motion. What we stated at the hearing was that it would have taken until on or about June 16, 1989, to render a decision, since the court was unaware that the matter was contested prior to May 17, 1989, and would have probably required post-hearing briefing to orient it to the issues in contest. However, we clearly could have been prepared to render a decision by June 16, 1989, and CC could have urged this court to terminate the stay as of June 16, 1989, if we had not done so. However, by ultimately agreeing to continue the final hearing until June 21, 1989, CC set back the running of the time pursuant to B. Rule 4001(a)(2) to at least July 21, 1989.

costs that he believed were accrued by CC after January 10, 1989. However, Feehrer admitted that he had not gone back over his checks to determine precisely what he believed were post-January 10, 1989, expenses.

The impartiality of Comer and the accuracy of his report has not been questioned. We thus choose to accept the figures in the report, obviously competently prepared from ample supporting data, over vague statements by Feehrer that he believed that the report was erroneous or misleading regarding the segregation of post-January 10, 1989 expenditures, based on mere suppositions. CC did not question Comer, during his testimony, about the accuracy of the report's figures. We therefore prefer them to the biased, unsupported statements of Feehrer.

### E. CC IS NOT ENTITLED TO APPROVAL OF A SECURITY INTEREST AS TO COSTS INCURRED BY IT AFTER JANUARY 10, 1989, NUNC PRO TUNC.

■ Remaining to support CC's motion is therefore only its request that we can, and should grant it a § 364(d) security interest as to costs incurred by it after January 10, 1989, *nunc pro tunc*. From *American Cooler*, CC gleans the principle that a *nunc pro tunc* application for borrowing should not be allowed unless (1) the court would have authorized such borrowing if a timely application had been made; (2) the court was persuaded that the creditors have not been harmed by the continuation of the business made possible by the loan; and (3) the debtor and lender honestly believed that they had authority to enter into a transaction. *American Cooler, supra,* 125 F.2d at 497. In addition to *American Cooler,* a Bankruptcy Act case, CC cites the following cases, some of which have recited the principles of the *American Cooler* in deciding matters under the Code: *In re Public Leasing Corp.,* 344 F.Supp. 754 (W.D.Okla.1972); *In re Gloria Manufacturing Corp.,* 65 B.R. 341, 348 (E.D.Va. 1985); *In re London, Inc.,* 70 B.R. 63, 65 (Bankr.E.D.Wis.1987); *In re Cascade Oil Co., Inc.,* 51 B.R. 877, 882 (Bankr.D.Kan.

1985); *In re Alafia Land Development Corp.,* 40 B.R. 1, 4 (Bankr.M.D.Fla.1984); and *In re Owners of Harvey Oil Center,* 25 B.R. 979, 984 (Bankr.E.D.La.1982).

■ We agree with the general principle enunciated in these cases and by Collier, *supra,* that granting *nunc pro tunc* approval of a financing agreement is within the power of a bankruptcy court. However, we are sensitive to the fact that *nunc pro tunc* approval of any matter, including a § 364 application, is reserved for extraordinary circumstances in the Third Circuit. *See In re Massetti,* 95 B.R. 360, 364 (Bankr.E.D.Pa.1989). *Cf. In re F/S Airlease II v. Simion,* 844 F.2d 99, 105–08 (3d Cir.1988); *In re Arkansas Co.,* 798 F.2d 645, 648–51 (3d Cir.1986); and *In re TM Carlton House Partners, Ltd.,* 93 B.R. 875 (Bankr.E.D.Pa.1988). The Bankruptcy Code includes specific procedural requirements which must be followed before a debtor's request to obtain credit can be granted. On the other hand, the Bankruptcy Act, under which *American Cooler* and several of the other cases cited *supra* were decided, is relatively unclear as to the procedural requirements for credit acquisitions and hence the procedural requirements were judge-made. *See* 2 COLLIER, *supra,* ¶ 364.01, at 364–2 to 364–5. We would therefore expect authorizations of credit in derogation of the Code's express provisions to be more difficult to obtain than *nunc pro tunc* applications in Act cases.

We also note that, with the exception of *Gloria Mfg., supra, nunc pro tunc* approval of financing was denied in all of the cases cited by CC. Moreover, in *Gloria Mfg.,* the court *had* approved the financing in issue, but had merely failed to make reference to § 364(c), under which the creditor sought approval, and/or the specific priority to which the creditor was entitled. It therefore was obliged to act *nunc pro tunc* only to add clarification to the security provided to the lender in a credit application which it had already permitted. Thus, these decisions suggest that, while the three criteria enunciated in *American Cooler* are necessary conditions to allow *nunc pro tunc* approval to a debtor's fi-

nancing arrangements, they are not, as CC suggests, sufficient conditions to allow same. Rather, we believe that there must be something more "compelling," *see Massetti, supra*, 95 B.R. at 364, in the nature of equities and absence of prejudice to any interested parties to allow such an extraordinary dispensation.

We cannot say that the three requirements set forth in *American Cooler* have been met here. It is not clear that we would have extended the time-periods of the Stipulation, upon learning that no Services Agreement between the parties had ever been put into place. The creditors have been harmed, if not by perpetuation of the relationship between the Debtor and CC *per se*, then by the costs which the estate must bear in resolving the uncertainty caused by the failure of the Debtor and CC to finalize a Services Agreement or seek an extension of the Stipulation. The Debtor and CC should have realized that, after January 9, 1989, they had neither court approval nor an agreement between them to sustain their relationship.

It cannot be forgotten that CC here seeks *nunc pro tunc* imposition of a lien in its favor pursuant to § 364(d). Since financing pursuant to § 364(d) contemplates the priming of other liens, a request under § 364(d) must be acted·upon more cautiously than motions under the other provisions of § 364. *See generally In re Reading Tube Industries, Inc.*, 72 B.R. 329, 332 (Bankr.E.D.Pa.1987); 2 COLLIER, *supra*, ¶ 364.05, at 364–12; and R. McCullough, *Analysis of Bankruptcy Code Section 364(d): When Will a Court Allow a Trustee to Obtain Post–Petition Financing by Granting a Superpriority Lien*, 93 COMMERCIAL L.J. 186, 205 (1988). CC has not cited any case where financing pursuant to § 364(d) was allowed *nunc pro tunc*.

■ It must also be recalled that adequate notice to all interested parties must precede the entry of any § 364 order. *See In re Garland Corp.*, 6 B.R. 456, 458 n. 2 (1st Cir. BAP 1980); and *In re Monach Circuit Industries, Inc.*, 41 B.R. 859 (Bankr.E.D.Pa.1984) (this court, per GOLDHABER, CH. J., vacates an order entered

under § 364(c) ex parte). Here, notice was given and all active interested parties had no objection to the entry of a Stipulation contemplating a Services Agreement expressly effective for *only 60 days*. We decline to infer consent to an extension of this period from the mere failure of any interested party to act to prevent the relationship of the Debtor and CC from continuing thereafter. Certainly, no act of this court, implicit or otherwise, extended the running of any Services Agreement beyond sixty (60) days.

Furthermore, at the close of the hearing on June 21, 1989, we expressed skepticism as to whether approval of financing *nunc pro tunc* was appropriate where even the immediate parties to the financing "agreement," *i.e.*, the Debtor and CC, had never executed the contemplated Services Agreement *inter se*, let alone had any extension to same beyond the sixty-day limitation set forth in the Stipulation approved by this court after notice to interested parties. In an attempt to overcome this glaring deficiency, CC cites to us several cases for the principle that, under Pennsylvania law, even in the absence of definite written terms, an enforceable agreement may arise from the parties' conduct and course of dealings. *E.g.*, *Caisson Corp. v. Ingersoll–Rand Co.*, 622 F.2d 672 (3d Cir.1980); *Girard Bank v. John Hancock Mut. Life Ins. Co.*, 524 F.Supp. 884 (E.D.Pa.1981); *Skrocki v. Caltabiano*, 505 F.Supp. 916 (E.D.Pa.1981); *Field v. Golden Triangle Broadcasting, Inc.*, 451 Pa. 410, 305 A.2d 689 (1973); and *Elias v. Elias*, 428 Pa. 159, 237 A.2d 215 (1968).

In certain factual contexts, this principle of Pennsylvania law should be applied, particularly where, as in *Caisson*, the parties express their agreement by completing the terms of the contract allegedly agreed to by them. 622 F.2d at 678. However, the certainty of the Services Agreement arrangement here, particularly as to the crucial element of its duration after sixty (60) days, is belied by its abrupt, unilateral termination by the Debtor, the reasons and justifications for which are not spread out on this record, on February 10, 1989.

Moreover, having no definite enforceable agreement on which to rely, CC was without a cause of action for damages from the Debtor suffered by it on account of this "breach."

■ A contract "is a promise or set of promises for the breach of which the law gives a remedy, ..." RESTATEMENT (SECOND) OF CONTRACTS, § 1, at 5 (1981). The nature and extent of at least its material terms "must be shown with certainty and conciseness." *Beachler v. Mellon–Stuart Co.*, 354 Pa. 341, 343, 47 A.2d 147, 149 (1946). *See also, e.g., Zukoski v. Baltimore & O. R.R.*, 315 F.2d 622, 635 (3d Cir.1962), *cert. denied*, 375 U.S. 856, 84 S.Ct. 118, 11 L.Ed.2d 83 (1963). The failure of the Debtor and CC to ever come up with a final form of the Services Agreement, containing the vital element of a durational provision, is fatal to CC's assertion that a valid Services Agreement contract existed, at least after January 10, 1989.

While it is true, as particularly the *Girard Bank* and *Field* cases cited by CC exemplify, that completion and execution of a contemplated formal written contract is not always a prerequisite for enforcement of an agreement, it is also true that "[w]here an intention is manifested in any way, that legal obligations between parties shall be deferred until a writing is executed, preliminary negotiations and agreements do not constitute a contract." *Watson v. Lehigh Valley Wood Work Co.*, 198 F.Supp. 273, 276 (E.D.Pa.1961). *Accord, Whitemarsh Twp. Authority v. Finelli Bros.*, 408 Pa. 373, 377–80, 184 A.2d 512, 515 (1962); *Essner v. Shoemaker*, 393 Pa. 422, 425, 143 A.2d 364, 366 (1958); and RESTATEMENT, *supra*, ¶ 27, at 78–79.

Particularly analogous is *Whitemarsh Twp.*, where the fact that a state statute required that a written bid must be submitted and signed was held to negate the validity of a bid submitted without the requisite corporate signatures. Here, a specific Bankruptcy Code section required that the specific terms of the incurrence of the debt of the Debtor to CC be not only established between the parties but also approved by an order of the court. Hence, we believe that, at least as to the parties' agreement subsequent to January 10, 1989, the formality of a written Services Agreement was a prerequisite to a valid contract between the parties.

A factual setting similar to that here was presented in *In re Roxy Roller Rink Joint Venture*, 73 B.R. 521 (Bankr.S.D.N.Y. 1987). There, the debtor and the lender were denied *nunc pro tunc* approval of financing, even under the requirements of § 364(c), less stringent than those of § 364(d), which is in issue here, due to the absence of a formal loan agreement between them. The court, although finding the elements of *American Cooler* present, *id.* at 524–25, denied the motion, *id.* at 525, for reasons articulated as follows:

> No *nunc pro tunc* order can, however, overcome the total absence of loan documentation present in this case. An order merely authorizes a debtor to enter into a transaction. It does not eliminate the need for appropriate agreements, including security agreements, between the debtor and the lender. *See generally*, 2 Collier on Bankruptcy (15th ed.1986), 364–11[1]. The absence of documents effecting a security interest in the Debtor's lease in favor of [the alleged secured creditor] is fatal to his claim for treatment as a secured creditor.

Although, here, a Services Agreement was drafted and a consensus concerning most terms apparently existed, there was no consensus concerning its duration, at least subsequent to the initial 60–day period specified in the Stipulation approved by this court. As in *Roxy Roller Rink*, the absence of an agreement between the debtor and the putative lender compounds the deficiency of failure to obtain authorization under § 364 for the parties' arrangement. We are therefore unwilling to grant CC the extraordinary dispensation which it seeks by granting it any security interest against the Debtor's property under § 364(d) as to costs which the Comer report indicates were incurred after January 10, 1989.

## F. CONCLUSION

Since CC has failed to establish that it has a valid security interest under § 364(d) or otherwise against the proceeds received by the Debtor or the Trustee subsequent to January 10, 1989, *see In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr.E.D.Pa.1987); and *In re Grant Broadcasting of Philadelphia, Inc.*, 71 B.R. 376, 384–85 (Bankr.E.D. Pa.), *aff'd,* 75 B.R. 819, 822–23 (E.D.Pa. 1987), it cannot prevail in this motion, which is dependent upon such a finding. Therefore, we must proceed to enter an Order denying its motion.