### In re BRANIFF INTERNATIONAL AIRLINES, INC., Debtor.

**Bankruptcy No. 091–71829–511.**

United States Bankruptcy Court,
E.D. New York.

Jan. 5, 1994.

Hughes Hubbard & Reed by David W. Wiltenburg, Jonathan Gross, New York City, for Chapter 11 Trustee.

Nixon, Hargrave, Devans & Doyle by Lynne C. Isensee, Stacy Aicher, New York City, for CrossLand Premium Funding, Inc.

Sidley & Austin by Claire S. Hancock, New York City, for American Tel. & Tel. Co.

Office of the U.S. Trustee by Scott Y. Stuart, Garden City, NY.

## OPINION

(Validity of Security Interest in Unearned Insurance Premiums)

MELANIE L. CYGANOWSKI, Bankruptcy Judge:

Abraham D. Sofaer, the Chapter 11 Trustee of Braniff International Airlines, Inc. ("Braniff"), has moved for an Order, pursuant to 11 U.S.C. §§ 105(a) and 364(c), determining the validity of a security interest claimed by Crossland Premium Funding, Inc. ("Crossland"). The Trustee asks this Court to determine whether Crossland has a security interest in unearned insurance premiums pursuant to certain premium finance agreements between Crossland and Braniff. Familiarity with the papers is assumed. The salient facts are summarized below.

### Factual Background

Braniff filed a petition for relief under Chapter 11 on August 7, 1991 and operated as a debtor-in-possession for approximately one year, until the Trustee was appointed on August 12, 1992.

While a debtor-in-possession, Braniff expanded its operations by increasing the size of its fleet of aircraft, level of service, number of flights and cities served. In particular, Braniff entered into several leases of aircraft and, as lessee and operator, Braniff purchased aviation insurance. It financed payment of its annual insurance premiums using funds lent to it by Crossland. On November 14, 1991, Braniff sought court approval, pursuant to 11 U.S.C. § 364(c), of the first of these insurance premium financing agreements with Crossland. Notice of the hearing was given to the twenty largest unsecured creditors, the United States Trustee and all parties who filed notices of appearance in this case. Crossland was not among those served with the application and notice of hearing. On November 21, 1991, the Court entered an Order (the "November Order") approving the insurance contract and premium financing agreement then in place (the "Agreement").

Several provisions of the Agreement are relevant to this dispute. Paragraph 2 of the Agreement states:

> [Braniff] gives [Crossland] a security interest in, and assigns to [Crossland] as security for any amount due under this Agreement, a) any and all unearned premiums and dividends which may be payable under the insurance policies ...

Paragraph 3 of the agreement provides:

> [Braniff] irrevocably appoints [Crossland] as its Attorney-in-Fact with complete authority to cancel the Policies, to demand, collect, sue for, receive and give receipt for all sums assigned above to [Crossland] and to execute and deliver on [Braniff's] behalf all documents, forms and notices relating to the Policies in furtherance of this Agreement. Any money received as Attorney-in-Fact shall be subtracted from any amount owed to [Crossland] by [Bran-

iff] and, if there is a surplus, it shall be paid to [Braniff] if it is greater than $1.00."

The Agreement also contains a paragraph entitled "Agent or Broker Warranty" which states:

> The undersigned warrants that [Braniff's] signature is genuine, [Braniff] has received a copy of the complete Agreement, that the policies are in full force and effect and the premiums are correct, that the policies listed can be cancelled by [Braniff] or [Crossland] on 10 days notice and the unearned premiums will be computed on the standard short rate or pro rata table except where indicated and that they are not written for a term of less than one year. The undersigned agrees to pay all unearned premiums, dividends and unearned commissions to CrossLand Premium Funding, Inc.

The Agreement further provides that, in the event of cancellation, Braniff is to pay finance charges on the balance due until it is paid in full at the contract rate of interest, and to pay Crossland its reasonable attorneys' fees.

Genatt Associates, Inc. ("Genatt"), Braniff's insurance broker, placed Braniff's aviation policy with four insurers. By way of various Notices of Financed Premium, the insurers also agreed to pay Crossland "all gross unearned premiums which may become available as a result of endorsement and dividends which may become available under the policy."

Following the November Order, Braniff leased ten additional aircraft and added them to the existing insurance policies by endorsements. Crossland again financed the premiums, and entered into five additional premium financing agreements with Braniff on January 6, 1992, February 7, 1992, February 17, 1992, March 24, 1992 and May 8, 1992 (the "Additional Agreements"). All of the Additional Agreements have the same terms, conditions and expiration date as the first, and all purport to grant Crossland a security interest in unearned premiums and refunds. None of them was presented to or approved by the Court. No creditor of this estate

(other than Crossland) and no other party in interest ever received notice of the Additional Agreements.

Braniff borrowed a total of $1,579,251.10 from Crossland, of which $1,192,447.29 has been repaid through scheduled monthly payments and exercise by Crossland of the security interest approved in the November Order, leaving an unpaid debt of $386,803.81.

On March 30, 1992, Braniff applied for Court authorization to enter into two aircraft lease agreements, *nunc pro tunc* to December 31, 1991 and January 15, 1992. These two planes were covered by the Additional Agreement dated January 6, 1992. Braniff's application for Court approval of these leases stated, in footnote 1, that:

> The Debtor has negotiated the terms for leasing six (6) additional aircraft ... the lease agreements for these six additional aircraft have not yet been executed by the Debtor, however, the Debtor is currently flying these aircraft and will shortly be presenting an application to the Court for the approval of these aircraft leases.

The application was noticed on all entities which had filed notices of appearance, the United States Trustee, the twenty largest creditors, all members of the Official Committee of Unsecured creditors, and counsel to the Committee. The lease agreements, copies of which were annexed to Braniff's application, specifically required Braniff to obtain various forms of insurance.

No one opposed Braniff's application. At the conclusion of the hearing held on April 14, 1992, the Court entered an Order approving the leases, upon which counsel to the Committee had indicated its "No Objection."

During the course of the Chapter 11 proceeding, Braniff filed with the Court operating reports which showed an increase in insurance payments, number of planes and number of employees for the period October, 1991 through March, 1992:

| Reporting Period | Date Filed | Insurance Expense | Number of Planes, Employees | |
|---|---|---|---|---|
| 10/91 | 12/04/91 | $102,000 | 1, | 169 |
| 11/91 | 2/14/92 | $ 14,300 | 2, | 208 |
| 12/91 | 2/14/92 | $186,900 | 2, | 293 |
| 1/92 | 3/09/92 | $239,100 | 4, | 630 |
| 2/92 | 4/13/92 | $486,800 | 8, | 925 |
| 3/92 | 6/30/92 | $471,100 | 8, | 1256 |

On July 2, 1992, Braniff abruptly halted its operations. Thousands of passengers were stranded, thousands more held worthless airline tickets, and all became creditors of Braniff's estate. Approximately 1300 employees were left without work and also became creditors for unpaid wages.

Because Braniff shut down prior to the end of the policy year, it became entitled to receive unearned prepaid premiums from the insurers totalling some $963,977.[1] Shortly thereafter, the Trustee was appointed upon the application of the Office of the United States Trustee. The Trustee and Genatt calculated that Crossland has received refunded premiums sufficient to satisfy the amount owed to it under the first and only Court-approved Order. Crossland asserts that it is entitled to receive, pursuant to the Additional Agreements, another $386,803.81, plus interest and attorneys' fees (the "Disputed Fund"). That sum is currently being held by the Trustee pending the Court's determination of the validity of the security interest granted to Crossland by the Additional Agreements.

## DISCUSSION

### I. *Property of the Estate*

#### A. *Contentions of the Parties*

Crossland asserts that the Disputed Fund is not property of Braniff's estate and advances several theories in support of this proposition.

First, Crossland contends that the Debtor's interest in property is to be decided under state law and that, pursuant to the Banking and Insurance Laws of the State of New York, refunds of unearned premiums are to be returned to the premium finance agency for the benefit of the insured. N.Y.Banking Law § 576 (McKinney 1990 &

---

1. Some of the unearned premiums returned resulted from changes in the planes and number of seats insured, and some resulted from the Debt-
or's default in payments due under the premium finance agreements and subsequent cancellation of policies.

Supp.1993); N.Y.Ins.Law § 3428 (McKinney 1985 & Supp.1993).[2]

The purpose of the statutes, Crossland asserts, is to protect a premium finance agency's ability to recover funds it advances to purchase insurance. To the extent that there is a surplus after the agency recovers those funds, Crossland concedes that the surplus is paid back to the insured. But Crossland claims that, since the statutes require the funds to be paid to the premium finance agency in the first instance, the agent who receives unearned premiums (in this instance, Genatt) holds them in constructive trust for the benefit of Crossland. Crossland thus argues that the estate has no greater right to the Disputed Fund than Braniff had, and must therefore take the funds subject to the constructive trust.

Crossland also asserts that a constructive trust arises from the assignment given it by Braniff under the Agreements. According to Crossland, Braniff, having assigned the unearned premiums to Crossland pursuant to the Agreements, may not now reclaim the premiums. Rather, Crossland contends that unearned premiums received by the insured are held in a fiduciary capacity for the assignee and thus a constructive trust should be imposed for the benefit of the premium finance agency.

Lastly, Crossland urges the Court to impose a constructive trust, claiming that to do otherwise permits the Debtor's estate to be unjustly enriched, in contravention of the laws of the State of New York. In support of its contention, Crossland argues that a wrongdoing need not exist for a court to impose a constructive trust; rather, one can be imposed even in the event of mistake.

The Trustee disagrees with Crossland's claims and asserts that the Disputed Fund is property of the Debtor's estate. In particular, the Trustee attacks Crossland's arguments as being circular: that Crossland, in focusing on its remedies, has forgotten that it must first have rights, which could come to it only with Court approval. The Trustee thus contends that the Agreements merely reflect loans by Crossland; that Braniff became the owner of the loan proceeds with a contractual obligation to pay the funds back; and that consequently, Crossland did not hold title to the funds.

The Trustee further disputes Crossland's contention that the Agreements and statutes create an independent property interest, arguing that they are merely enforcement mechanisms available to Crossland to use to enforce a valid security interest, if one exists. According to the Trustee, the legislative intent behind New York's statutory scheme is to protect the insured from overreaching; because the provision of the statute requiring turnover to the premium finance agency arises in the context of a statutory section dealing with cancellation of a policy, the only consequence of a failure to remit unearned premiums to the finance agency is that the purported cancellation of an insurance policy is ineffective. The Trustee further points out that Section 576 of the Banking Law requires the unearned premiums to be returned to the premium finance agency *"for the benefit of the insured."* He argues that

---

**2.** Crossland relies primarily on Section 576 of the Banking Law. That section provides, in relevant part:

1. When a premium finance agreement contains a power of attorney or other authority enabling the premium finance agency to cancel any insurance contract or contracts listed in the agreement, the insurance contract or contracts shall not be cancelled unless such cancellation is effectuated in accordance with the following provisions:

    \*    \*    \*    \*    \*    \*

(f) The insurer or insurers within a reasonable time not to exceed sixty days after the effective date of cancellation, shall return whatever gross unearned premiums are due under the insurance contract or contracts on a pro rata basis to the premium finance agency for the benefit of the insured or insureds. However, upon such cancellation the insurer or insurers shall be entitled to retain a minimum earned premium on the policy of ten percent of the gross premium or sixty dollars, whichever is greater.

A parallel provision of the Insurance Law, Section 3428, provides, in relevant part:

Whenever an insurance contract the premiums for which are advanced under a premium finance agreement ... is cancelled the insurer ... within a reasonable time not to exceed sixty days after the effective date of the cancellation shall return whatever gross unearned premiums are due under the insurance contract ... to the ... premium finance agency ... for the benefit of the insured....

this statutory language evinces the Legislature's attempt to define the true beneficial owner of the refund.

Finally, the Trustee contends that even if Crossland is able to establish its title, there is still no basis for a constructive trust to be imposed, because (i) there has been no wrongdoing by the Trustee or Genatt, and (ii) no unjust enrichment inures to the Debtor's estate at the expense of Crossland.

### B. *Discussion*

■ It is well established that property which a debtor holds in trust for another is not property of the bankruptcy estate because the debtor does not have an equitable interest in it. *Begier v. IRS,* 496 U.S. 53, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990); 11 U.S.C. § 541. In particular, Section 541(d) provides:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest ... becomes property of the estate under subsection (a) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

This principle was amplified by the Court of Appeals for the Second Circuit in *In re Howard's Appliance Corp.,* 874 F.2d 88 (2d Cir.1989):

> Where the debtor's "conduct gives rise to the imposition of a constructive trust, so that the debtor holds only bare legal title to the property, subject to a duty to reconvey it to the rightful owner, the estate will generally hold the property subject to the same restrictions." ... Indeed, the Supreme Court has declared that, while the outer boundaries of the bankruptcy estate may be uncertain, "Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition. . . ."

874 F.2d at 93 (citations omitted); *see also In re Altchek,* 124 B.R. 944, 958 (Bankr. S.D.N.Y.1991) ("Any right to proceeds or profits from this property would be excluded from his estate by 11 U.S.C. § 541(d) be-cause he does not hold the equitable interest in the property").

The Court agrees with that part of Crossland's argument that the estate has no greater right to the Disputed Fund than Braniff had. Therefore, were the Court to impose a constructive trust on the Disputed Fund, it would not be property of this estate. For the reasons that follow, however, the Court concludes that a constructive trust should not be imposed.

■ Looking first at the state statutes, the Court disagrees with Crossland's contention that they provide the underpinning for a constructive trust. At best, the statutes provide, as the Trustee argues, a mechanism whereby a premium finance agency can obtain any funds owing to it by an insured. The statutes do not, in and of themselves, create the debt in the first instance or elevate the status of any debt owing to the premium finance agency independent of the obligation owed by the insured. Said another way, the statutes merely provide a payment mechanism whereby a refund of any unearned premiums is routed first to the premium finance agency which can take any funds owing it prior to passing the surplus on to the insured. If no debt is owed the finance agency, the statutes do not create one. They do not change the nature of the relationship between the insured and the finance agency from that of a debtor and creditor to that of a trustee and beneficiary. Therefore, they do not give rise to a constructive trust as they neither impose an independent obligation nor create a fiduciary relationship among the parties.

The legislative history of the bill enacting the provisions upon which Crossland relies does not suggest any different construction. Rather, it indicates that the bill was enacted to "meet a public need for the establishment of properly qualified insurance premium finance agencies licensed, supervised and regulated by the Superintendent of Banks." Banking Dep't Mem. on Bill before the Governor for Executive Action, at 42 (1960). The legislative history shows that the bill was opposed "by a few companies on the ground that the rates provided for in the bill are too low to enable them to operate at a

profit." *Id.,* at 49. To meet this objection, the Banking Department argued as follows:

It is believed that the maximum rates provided for in the bill are fair and equitable. The element of risk involved in the financing of insurance premiums is slight, if the business is properly conducted.... As security for the loan, the financing agency receives a power of attorney from the insured permitting cancellation of the policy upon non-payment of the installments. If such installments are not paid by the insured, the financing agency cancels the policy and receives a rebate of the insurance premium.... The element of risk can be greater if the financing agency does not cancel in time or if the insurer rebates to the insurance agent and not to the financing agency and the agent is delinquent in turning over the moneys to the financing agency or converts them to his own use. Both such practices have been prevalent in cases where some of the smaller companies have been particularly dependent upon the insurance agents for their business. It is obvious, however, that the financing agency can cancel in time and can require that payment be made directly to it. Consequently, there is no reason why the public should be required to pay for inefficient business practices on the part of certain financing agencies.

*Id.,* at 50–51.

Thus, the statutes are designed to regulate, among other things, the rates charged by premium finance agencies. The particular provisions cited by Crossland are intended to reduce the economic risk to the premium finance agency in the event of a default by the insured. At most, the statutes recognize a pre-existing obligation that might potentially be owing the finance agency and provide a manner in which the finance agency may be paid. The Court thus finds nothing in the statutory scheme or legislative history which suggests that a premium finance agency should stand in shoes different from those of any other creditor when bankruptcy intervenes.

■ The case of *Yonkers Board of Education v. Richmond Children's Center, Inc.,* 58 B.R. 980 (S.D.N.Y.1986), relied upon by Crossland, is distinguishable. In *Yonkers,* the Debtor was a care facility for mentally retarded children. Pursuant to New York's Education Law, the Debtor, Richmond Children's Center, Inc. ("Richmond"), contracted with the City of Yonkers ("Yonkers") to provide public education for the children resident in Richmond's facility, and was charged tuition by Yonkers. Richmond, upon receiving an invoice from Yonkers, would verify the children's attendance and submit the invoice to the New York State Department of Education, which would then issue a check to Richmond, with instructions to pass it on to Yonkers. When the Debtor filed, it had deposited such a check in its account and listed Yonkers as an unsecured creditor. Yonkers sought to impose a constructive trust on this "pass-through" payment, which the Bankruptcy Court declined to do, on the ground that neither the contract between Yonkers and Richmond nor the statutory scheme gave rise to a constructive trust.

District Court Judge Charles L. Brieant, Jr., in reversing the Bankruptcy Court, concluded that the contract between Yonkers and Richmond "imposed no duty of payment out of its own funds on Richmond, gave no benefit to Richmond, and gave the children nothing more than that to which they were already entitled under state law.... The Debtor's obligation was merely that of auditing claims and passing through payments, and the Debtor properly should be regarded as an intermediary." Further, the Court held that pursuant to "the statutory scheme, as interpreted and applied by the New York State Education Department, money paid to a care facility by the State ... is not for the financial benefit of the facility, but intended rather for the sole benefit of the children, and known so to be by the recipients. Accordingly, it constitutes a constructive trust in the hands of the facility for payment to the school district."

In contrast, the contract between Crossland and Braniff imposed a duty upon Braniff to repay the moneys lent to it, and created a debtor/creditor relationship. The services provided pursuant to the Agreements conferred a benefit upon *Braniff,* not upon some

third party. Therefore, Braniff may not properly be viewed as a mere "conduit" for the funds. In addition, the Disputed Fund at issue here is not a legislative appropriation for the benefit of a third party, as was the case in *Yonkers*.

■ Moreover, Crossland's argument that the refunded premiums are not property of the estate because they were assigned to Crossland is flawed, because it puts the cart before the horse. It implicitly assumes the validity of the assignment. Since the assignments took place post-petition, however, their validity must be determined in the light of 11 U.S.C. § 549. That section provides:

(a) Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—

(1) that occurs after the commencement of the case; and

(2) ... (B) that is not authorized under this title or by the court.

Therefore, when determining the validity of an assignment, the Court looks to whether property of the estate has been transferred, not the other way around. To the extent that property has been assigned post-petition and without court authorization, the Trustee may avoid the assignment. *In re Photo Promotion Assoc., Inc.*, 881 F.2d 6, 8 (2d Cir. 1989) (Trustee may avoid and recover unauthorized post-petition assignment of accounts receivable). The cases cited by Crossland are distinguishable because they involve *pre-petition* assignments of insurance proceeds. *See In re McClean Indus., Inc.*, 132 B.R. 271 (Bankr.S.D.N.Y.1991); *In re Moskowitz*, 14 B.R. 677 (Bankr.S.D.N.Y.1981).

Nor do the various Agreements give rise to a constructive trust. The elements of a constructive trust are well settled. As Chief Judge Conrad B. Duberstein explained in *In re American Motor Club, Inc.*:

A constructive trust is a court created equitable remedy to prevent unjust enrichment. ... Under New York law, the factors which the courts look for in establishing a constructive trust are: (1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer

made in reliance on that promise; and (4) unjust enrichment.

*In re American Motor Club, Inc.*, 109 B.R. 595, 599 (Bankr.E.D.N.Y.1990). A constructive trust has been imposed in the absence of a finding of any wrongdoing. *See, e.g., In re Fagan*, Case No. 093–70491–511 (Bankr. E.D.N.Y. Dec. 15, 1993). A constructive trust has also been imposed in the absence of a fiduciary relationship or one of the other factors described above. *Id.* The Court is aware of no instance, however, where a constructive trust has been imposed in the absence of all of these factors.

■ A fundamental purpose of bankruptcy laws is "to place the property of the bankrupt, wherever found, under the control of the court, for equal distribution among the creditors." *MacArthur Co. v. Johns–Manville Corp.*, 837 F.2d 89, 91 (2d Cir.), *cert. denied*, 488 U.S. 868, 109 S.Ct. 176, 102 L.Ed.2d 145 (1988) (*quoting In re Chanticleer Assoc., Ltd.*, 592 F.2d 70, 73–74 (2d Cir.1979)). This policy runs counter to that underlying the imposition of a constructive trust. As stated by Bankruptcy Judge Marvin A. Holland:

Quintessential to the philosophy upon which the Bankruptcy Code is founded is the principle of equality of distribution. ... Therefore, the interests of the general creditor body are always before the court. This is a Chapter 7 case; any relief granted by the plaintiff will come out of the pockets of the creditors, not the debtors. To permit the plaintiff to profit from its own negligence at the expense of those who have dealt with the debtor in a more diligent fashion would be to ignore the purpose of the Bankruptcy Code. A court of equity in decreeing a constructive trust is bound by no unyielding formula. The equity of the transaction must shape the measure of relief.

*In re Vichele Tops, Inc.*, 62 B.R. 788, 792 (Bankr.E.D.N.Y.1986) (Declining to impose a constructive trust).

Particularly where, as here, there is no good basis for imposing a constructive trust, the Court declines to do so. The Disputed Fund is thus property of the estate.

## II. *Crossland's Security Interest*

■ The Trustee and several creditors[3] object to Crossland's claimed security interest on the ground that Crossland failed to comply with Section 364 which provides, in relevant part:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, *the court, after notice and a hearing, may authorize* the obtaining of credit or the incurring of debt—
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;
>
> (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or
>
> (3) secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364 (Emphasis supplied).

Crossland concedes that the Additional Agreements were not approved by the Court pursuant to Section 364(c). Crossland asserts, however, that it is entitled to approval of the Additional Agreements *nunc pro tunc.*

The objecting creditors disagree and argue that *nunc pro tunc* approval is inappropriate because due process requires prior notice and opportunity for creditors to object to the post-petition grant of any security interest in property of the estate. They contend that if Crossland had complied with the notice and hearing provisions of Section 364(c), they might well have objected to further secured financing. The objecting creditors also point out that Braniff's lease of the additional aircraft for which Crossland provided insurance premium financing was also unapproved. Consequently, they argue that compliance with section 364(c) by the Debtor and Crossland would have served the salutary purpose of giving creditors insight into the Debtor's activities. This would have proved particularly invaluable since "serious questions have been raised about those activities which led to Debtor's abrupt cessation of operations."

The Court concurs that a determination as to whether Crossland has a valid security interest in the unearned premiums is tantamount to *nunc pro tunc* approval of the Additional Agreements. Consequently, this Court must determine whether the agreements should be approved *nunc pro tunc.*

■ The standard to be applied in determining whether such approval is appropriate was set forth half a century ago in a case decided under the Bankruptcy Act, *In re American Cooler Co.,* 125 F.2d 496 (2d Cir. 1942). The *American Cooler* case states:

> We think that the judge should not retroactively validate the loan unless he is confident that he would have authorized it if a timely application had been made, and unless, in addition, he is reasonably persuaded that the creditors have not been harmed by a continuation of the business made possible by the loan. He should also take into account, as bearing on the good faith of the debtor and lender, whether or not they honestly believed that they had authority to enter into the transaction. Of necessity, each case must stand on its own facts, and these criteria cannot be mechanically applied; they should, however, materially facilitate the preparation of an intelligent record. We should emphasize that this equitable power must be cautiously exercised, and that only a foolhardy lender will attempt to make it serve as a substitute for proper authorization.

*American Cooler,* at 497.

Several more recent cases have questioned the precedential value of *American Cooler.* As stated by Bankruptcy Judge James E. Yacos:

> The current Bankruptcy Code contains provisions which provide an express procedure for obtaining authorization for continued borrowing on a secured basis, i.e., § 364.... In this procedural context, in which relief is available in a matter of days—even hours if the circumstances are urgent—the rationale for permitting retro-

---

**3.** Aeron Aviation Resource Holdings, II, Inc. ("Aeron Aviation") and American Telephone & Telegraph Company, on behalf of its subsidiary AT & T Communications, Inc. ("AT & T"), an administrative creditor with a post-petition claim of approximately $1.7 million, object to Crossland's claim of a security interest on essentially the same grounds as the Trustee.

active validation orders for secured borrowing and attachment of liens to post-petition transactions no longer exists. *In re J.L. Graphics, Inc.*, 62 B.R. 750, 755 (Bankr.D.N.H.1986).

Judge Yacos declined to retroactively validate an unapproved post-petition transaction, on the ground that "to do otherwise would be to re-write the statute, contrary to its clear intent, to mean that a debtor and secured party can effectively create a valid post-petition transaction, based merely on their own agreement, for however long they choose to delay in bringing the matter before the court." *J.L. Graphics, Inc.*, at 756.

The Court of Appeals for the Second Circuit has continued to look to the criteria set forth in *American Cooler* since the enactment of the Code. *In re Photo Promotion Assoc., Inc.*, 881 F.2d 6, 9 (2d Cir.1989). Several other courts also continue to apply *American Cooler, see, e.g., In re Roxy Roller Rink Joint Venture*, 73 B.R. 521 (Bankr. S.D.N.Y.1987), albeit cautiously. *In re City Wide Press, Inc.*, 102 B.R. 431, 436 (Bankr. E.D.Pa.1989) ("we would expect authorizations of credit in derogation of the Code's express provisions to be more difficult to obtain than *nunc pro tunc* applications in Act cases"); *In re Grand Valley Sport & Marine, Inc.*, 143 B.R. 840, 851 (Bankr. W.D.Mich.1992) ("extraordinary factual situations may dictate authorization of *nunc pro tunc* approval of post-petition financing ... such factual situations must be more 'compelling' than simply meeting the standards set forth in *American Cooler* "). *See also In re Cascade Oil Co.*, 51 B.R. 877 (Bankr.Kansas 1985).

The Court therefore concludes that the *American Cooler* factors continue, at minimum, to dictate the propriety of retroactive approval for unauthorized post-petition financing. For the reasons set forth below, the Court also concludes that retroactive approval of the Additional Agreements is inappropriate in this case.

■ The first prong of the *American Cooler* test is whether approval would have been granted if a timely application had been

made. The Trustee argues that this first threshold cannot be met. According to the Trustee, had approval of the Additional Agreements been timely sought, the Court and the creditors would have been on notice that Braniff was rapidly expanding its operations,[4] and the Court may well have halted this unbridled expansion.

Crossland, in turn, asserts that the fact that the Court approved the first premium financing agreement is evidence that it may have approved others. Crossland further points out that the Court approved two aircraft leases in April 1992, after four of the five Additional Agreements had already been entered into, and that it is unreasonable to suggest that the Court would have allowed the Debtor to lease aircraft, and yet fly them uninsured. Crossland states that "creditors knew or reasonably should have known that Debtor had to obtain aviation insurance to fly those planes ..." and that "any creditor interested enough in the progress of the Chapter 11 proceeding to object to further secured financing would have so objected to the Aircraft Application." Since the Committee had no objection to the aircraft leases in April 1992, Crossland argues that there is every reason to believe that the Court would similarly have approved the Additional Agreements.

The Court agrees with Crossland that it is likely that the Court would have approved the Agreement entered on January 6, 1992, if timely application had been made. That Agreement provided for financing of insurance coverage for the two planes Braniff leased in April. It does not follow, however, that the Court would have approved an unlimited number of aircraft leases and insurance premium finance agreements. If the Court and the creditors had known that Braniff was increasing its fleet by six rather than only two planes and quadrupling its work force, it is quite possible that approval would not have been forthcoming.

The second prong of the *American Cooler* test looks to whether creditors have been harmed by the continuation of the business made possible by the transaction. The

4. Braniff quadrupled its fleet and its work force between December, 1991 and March, 1992.

Trustee points out that thousands of passengers became involuntary creditors of Braniff the day it shut down. He also points to the administrative debt created by Braniff's sudden cessation of business, estimated to be in excess of $10,000,000, and asserts that the shutdown may be attributed to the airline's rapid expansion, which was partially made possible by Crossland's unauthorized extensions of credit to Braniff.

Crossland responds that the Debtor's expansion was revealed in its operating reports and, consequently, creditors were on notice of the expansion and its risks. Crossland also asserts that it would have been more harmful to creditors if the Court had decided to not authorize aircraft insurance.

As to the second prong, the Court concludes that the creditors have been harmed by the continuation of business made possible, in part, by Crossland's unauthorized loans. Although it is true that Braniff's expansion was slowly but surely revealed in its operating reports, those reports were not timely filed with the Court and, as a result, the magnitude and speed of the expansion were not revealed in any meaningful way until it had already occurred. For instance, the operating report which showed for the first time that the Debtor had increased its fleet of leased planes to *eight* was filed with the Court on April 13, 1992, the day before the hearing seeking approval of *two* aircraft leases. Only the most diligent creditor could be expected to monitor the papers filed with the Court on a daily basis. Similarly, the operating report for the month of March 1992, showing an increase in the work force from 925 to 1256, was not filed until June 30, 1992, two days before Braniff ceased operations.

There is no doubt that but for the insurance made possible by Crossland's loan, Braniff could not have flown the aircraft and accommodated as many passengers as it did; nor would it have needed the work force it employed. The administrative debt created by the sudden stoppage is a direct result of the increased number of passengers and employees.

With respect to the third prong of *American Cooler*, the Trustee argues that the fact that the first Agreement was properly brought to the Court for approval shows that Crossland knew that Court approval of the Additional Agreements was required. Crossland says that it never dealt directly with Braniff. Rather, Crossland contends it only dealt with Genatt, who assured it that the transactions were proper and at no time informed it that the Additional Agreements needed further Court approval. Crossland also contends that it did not have bankruptcy counsel to advise it.

As a general rule, the Court is reluctant to allow a well-established creditor like Crossland to hide behind protestations that it acted *pro se* and relied upon third parties as its sole source of information respecting a debtor-in-possession. The Court finds such conduct disturbing, and would normally hold that such a creditor acts at its peril. Nevertheless, in the unique circumstances of this case, the Court concludes that Crossland "honestly believed" that its transactions were proper. Although a party to the finance agreements, Crossland was never served with Braniff's application for Court approval. Consequently, the Court is not persuaded by the Trustee's argument that Crossland was aware of the approval process because of the first application. Nor is there anything in the record to suggest that Crossland knew that the first Agreement had been submitted to the Court for approval.

Nonetheless, the Court disagrees with Crossland's argument that the Additional Agreements were somehow covered by the Court's approval of the first Agreement. Although the Agreement approved by the November Order provides Crossland with a security interest in unearned premiums "under the policy," the requirements of Section 364(c) may not be circumvented by financing endorsements to an existing policy. Were this to be permitted, additional secured claims could easily be created to the prejudice of creditors without notice and hearing.

■ Nor does the Court agree with Crossland's contention that the financing agreements did not require court approval because they were made in the ordinary course of the Debtor's business. Section 364(a) on its face refers only to extensions of *unsecured* credit. Crossland, having failed to obtain court approval of its agreements under Section

364(c), cannot "fall back" on Section 364(a). *In re Photo Promotion Assoc., Inc.,* 87 B.R. 835 (Bankr.S.D.N.Y.1988), *aff'd,* 881 F.2d 6 (2d Cir.1989).

Finally, balancing of the equities favors the estate, not Crossland. By declining to retroactively approve the Additional Agreements, the Court inflicts less harm upon Crossland than that which would be inflicted upon the estate if *nunc pro tunc* approval were granted. As the Trustee points out, Crossland has already received the lion's share of what it was owed; Crossland received approximately $1.1 million of the $1.6 million debt. No other creditor of this estate is likely to receive a similar return. While it may be true that even if Crossland were to receive the Disputed Fund, it would not be receiving interest and attorneys' fees, Crossland had it within its power to protect its interests. The same cannot be said for the passengers and employees of the failed Debtor.

### III. *Other Contentions*

■ Notwithstanding its solidarity with the Trustee's position, Aeron Aviation claims that the Trustee should have proceeded by way of an adversary proceeding. It is true that a party seeking a court determination as to the validity of a lien must ordinarily commence an adversary proceeding, *see* Fed. R.Bankr.P. 7001(2). Where a party has proceeded by motion and the record has been adequately developed, however, courts have reached the merits of the dispute despite the procedural irregularity. *In re Jablonski,* 70 B.R. 381, 385 (Bankr.E.D.Pa.1987), *aff'd in part and remanded in part,* 88 B.R. 652 (E.D.Pa.1988); *In re Command Serv. Corp.,* 102 B.R. 905, 908 (Bankr.N.D.N.Y.1989).

■ Aeron Aviation also argues that Crossland lacks a valid security interest under Article 9 of the Uniform Commercial Code ("UCC") because that statute requires security interests in intangibles and money to be perfected by either a proper filing or possession. Aeron Aviation contends that there is no evidence that Crossland's purported security interest was ever perfected.

Aeron Aviation's argument fails, however. Section 9–104 of New York's version of the UCC provides that "[t]his Article does not apply ... to a transfer of an interest or claim in or under any policy of insurance...." Therefore, the creditor need not file a UCC financing statement or take any other action to perfect its security interest in unearned premiums. *In re RBS Industries, Inc.,* 67 B.R. 946 (Bankr.D.Conn.1986). As noted above, however, the Court has concluded that Crossland has no security interest in the Disputed Fund because of its failure to timely obtain Court approval, pursuant to 11 U.S.C. § 364, of the security interest granted under the Additional Agreements.

### CONCLUSIONS OF LAW

1. The Court has jurisdiction over the subject matter and the parties to this core proceeding pursuant to 28 U.S.C. § 1334 and §§ 157(b)(2)(E), (K).

2. There is no basis for imposing a constructive trust over the Disputed Fund. Consequently, the Disputed Fund is property of the estate pursuant to 11 U.S.C. § 541.

3. Crossland failed to timely seek court approval of its alleged security interest in the Disputed Fund. The Court declines to approve, *nunc pro tunc,* the Additional Agreements pursuant to 11 U.S.C. § 364(c). Consequently, Crossland has no cognizable security interest in the Disputed Fund.

The Trustee is directed to settle an order consistent with the Court's decision.