## In re LEHIGH VALLEY PROFESSIONAL SPORTS CLUBS, INC., Debtor.

### No. 00–11296DWS.

United States Bankruptcy Court, E.D. Pennsylvania.

March 28, 2001.

---

Stuart M. Brown, Philadelphia, PA, for debtor.

Atlantic League of Prof. Baseball Clubs, c/o Robert Klein, Conrad, O'Brien, Gellman & Rohn, PC, Philadephia, PA.

Aris Karalis, Ciardi, Maschmeyer & Karalis, PC, Philadelphia, PA, for Committee of Unsecured Creditors of Lehigh Valley Professional Sports Clubs.

John E. Kaskey, Braverman, Kaskey & Caprara, Philadelphia, PA.

Dave P. Adams, Office of U.S. Trustee, Philadelphia, PA, U.S. Trustee.

## MEMORANDUM OPINION

DIANE WEISS SIGMUND, Bankruptcy Judge.

Before the Court is the Debtor's Motion for Authority to Obtain Secured Post–Petition Financing Pursuant to 11 U.S.C. § 364(d) (the "Motion").[1] Significantly the Motion was filed September 26, 2000 as the Debtor's operations were about to cease[2] and seeks authority *nunc pro tunc* to August 16, 2000 for financing from the League.[3] The Motion, having been filed on an expedited basis, was scheduled for hearing on October 23, 2000. The Official Committee of Unsecured Creditors (the

1. The Motion does not request, in the alternative, that the advances made by the League be accorded administrative expense status or even unsecured claim status, and therefore I do not reach that question. I do note that there is no contention that the credit was extended in the ordinary course of debtor's business obviating the need for bankruptcy court approval. 11 U.S.C. § 364(a). Moreover, the Committee argues that the advances were not an extension of credit to the Debtor but rather fulfillment of the League's obligation to pay all expenses of its member teams. Given the limited relief sought by the Debtor, *i.e.*, secured lending under § 364(d), I find that I do not have to reach that issue either at this juncture and in this context.

2. The Debtor owns a membership in the Atlantic League of Professional Baseball Clubs (the "League") and fielded a baseball team, the Black Diamonds, during the 2000 season which concluded contemporaneously with the filing of the Motion.

3. The statutory authority for the Motion only allows the trustee (*i.e.*, debtor-in-possession) to seek post-petition financing. While nominally the Motion has been brought by the Debtor, no benefit to the estate from this relief has been proven or even alleged; the real party in interest is the League. The Debtor no longer needed financing when the Motion was brought. Rather the Motion appears to reflect some accommodation that the Debtor made with the League at some point to try to protect the funds that it had voluntarily expended in paying certain of Debtor's creditors without seeking court approval. Since neither the Debtor's principal, Thomas Flaherty (who has been conspicuously absent at recent hearings), nor any other representative of the Debtor testified, there is no evidence as to why the Debtor sought this financing. Based on the record made, the Debtor's prosecution of this Motion represents a questionable exercise of fiduciary duty to creditors and the estate.

"Committee") filed a 16–page objection (the "Objection") on October 2, 2000. With the future of the case in limbo, the Debtor, with the support and concurrence of the League, continued the hearing to December 4, 2000 and then January 30, 2001 consistent with a pending asset sale of motion. On January 30, a further continuance was requested but denied, and the matter was set down for evidentiary hearing on March 1, 2001. During the adjourned hearing periods the League continued to pay certain of the Debtor's bills and expenses. The Motion seeks authority to borrow *nunc pro tunc* to August 16, 2000 an amount equal to the aggregate expenditures [4] made by the League from August 16 to December 8, 2000 for which the League would be granted a first lien and security interest pursuant to § 364(d). For the reasons set forth below, the Motion is denied.

## BACKGROUND

After an initial unsuccessful attempt early in the case to deprive the Debtor of an opportunity to reorganize by seeking to pierce debtor's exclusive right to file a plan, the League cooperated with the Debtor in its efforts to field a baseball team during the 2000 season. It was common knowledge to all parties that the operation of a baseball team without having a permanent stadium is a losing economic proposition, and indeed the Committee objected to the Debtor so doing. However, the League insisted on the Black Diamonds playing, contending that the failure to do so would be a breach of the Debtor's membership agreement and cause for its termination. The Debtor, in its business judgment, decided not to take the risk. Based on the expert testimony produced during the exclusivity contest of potential value of the League membership and Flaherty's overly optimistic assurances of the Debtor's ability to fund the 2000 season through personal contributions and investment capital, the Committee's objection was not sustained. As a result the team was fielded and struggled through the entire season to pay its expenses.

On or about August 15, 2000, the Debtor's financial situation reached crisis proportions. Flaherty was not infusing any more funds, and the Debtor could not secure further tranches of capital from investors to fund the facility approved by the Court under § 364(d).[5] The ball players learned of the Debtor's lack of cash and threatened not to play. An emergency motion was filed in this Court by the League seeking relief from the stay. It was heard at 5:30 p.m. on August 16 shortly before that night's game was to commence. Recognizing that the emergency could be ameliorated by paying the players, I suggested that the League loan to the Debtor funds sufficient to pay that week's payroll and that given the emergency, I was prepared, on its oral motion, to grant it protection for the amounts advanced. Transcript of 8/16/00 hearing ("N.T.") at 17. This would allow the game to be played which was not only in the Debtor's best interest so as not to put its membership at risk of termination but also in the League's best interest to preserve the integrity of its schedule and prevent loss to the other member team. *Id.* For

---

4. Also included in the "loan" is the $30,000 League assessment imposed on all League members according to the parties' agreements.

5. The loan, from New Life Horizons, Inc. for itself and as agent to unspecified participants, authorized up to $500,000 of secured loans.

Doc. No. 257. Under this facility $355,000 was advanced by various individuals with a view toward converting the loans to investment in the reorganized debtor. The entire facility was not utilized because no one was willing to extend further credit to the Debtor.

reasons never made clear,[6] the League rejected that approach, opting instead to make loans to the players directly. N.T. 22–23.

Joe Klein, the Executive Director of the League, testified in support of the Motion. He stated that the Debtor was unable to make the payroll on August 15, and the players were refusing to play the August 16 game in Aberdeen, Maryland. To head off the crisis, the night before the League had made a loan to the players who endorsed their checks to the League.[7] The Debtor's checks were then held until the Debtor had sufficient funds whereupon they were negotiated by the League and used to repay the player loans. This drill was repeated with the payrolls of August 31, September 15 and September 30, 2000. Only the Debtor's promises to make good on the paychecks endorsed and held by the League were not fulfilled. The League has not been repaid these loans to the players and while contending that it has not waived repayment from the players, seeks in the first instance recovery from the Debtor.

Contemporaneously with the payroll transaction, the Debtor asked the League to assist with the funding of operations for the balance of the 2000 season. The Debtor estimated that it would require an additional $200,000. Exhibit D–12. The League's response to that request was not disclosed. However, it is apparent from Exhibit D–1 that beginning August 16 and continuing through December 8, 2000, the League was paying the costs that were necessary to complete the playing season.[8] In addition to player salaries and meal money, the League paid charges for hotels, transportation, equipment and supplies directly to the obligees. The Debtor never obtained authorization to borrow funds from the League before these third party payments were made.

In this and numerous prior hearings, League representatives have stressed the impact that the Debtor's inability to honor its financial and performance commitments has on its reputation and credibility with the public. Unfavorable media attention resulting from a League member's failure to pay its debts casts a negative shadow on the League as well as the team. The League's responsibility is to ensure the smooth functioning of the baseball season so as to instill confidence in the public that supports its activities with their entertainment dollars. Because of the collective nature of a baseball league, the members are interdependent in certain respects. Thus, the inability of the Black Diamonds to play not only harms the Debtor but also the other teams who are scheduled to play with it. Accordingly, when asked why the League continued to advance these sums to pay Debtor's expenses, Joe Klein stated that it was necessary for the integrity of

---

**6.** I surmise that in this manner the League did not facilitate a cure by the Debtor of the monetary default that supported its motion for relief.

**7.** The fact that the League had already covered the situation by these loans was not revealed to the Court when the emergency motion was filed. Rather I believed that the players were refusing to play that night because of non-payment. Of course, had I known that the players had been paid, I would not have had to convene a hearing, on

hours notice, at 5:30 p.m. In fact, when Klein arrived in Aberdeen after the hearing, the players were in the third inning of play.

**8.** Klein testified that the Exhibit D–1 payments, consisting of 46 checks written and certain other claimed expenses "not in the system" but paid and the $30,000 League dues, represent satisfaction of all Debtor's unpaid debt incurred during the season excluding payroll taxes which remain unpaid. No total of expenses was calculated although an estimate of $150,000 was profferred.

the League and credibility with the media and public. Moreover, the League needed the Black Diamonds to show up to maintain the schedule or other of their teams would suffer. In recognition of the importance to the League of its members honoring their financial obligations, the League requires each member to fund its pro rata share of a fund that is kept on reserve to satisfy the unpaid operating expenses of a member.[9]

A review of the payments made underscores the importance to the League of having the Debtor's expenses satisfied. Notably many of the expenses were paid although payment was not necessary to secure a service then required to operate the team. For example, a post season payment to the Long Island Ducks (a member team) in the amount of $2,394.22 was for a bill issued the previous May. A payment on August 28 to the Werner Bus Lines in the amount of $1,884 was for transit in July, and another payment of $7,612.50 on September 15 to Werner Bus Lines was on account of two other prior road trips. Payment of $1,467 on September 18 was made to the Newark Bears (a member team) for meals earlier in the season. Indeed about half of the payments sought to be covered by this "loan" were made after the season had concluded. Exhibit D–1.

The Committee objects to the Motion for the following principal reasons: (1) the Debtor cannot satisfy the requirements of § 364(d) because the loan is of no benefit to the estate, fails to preserve its assets and the League is not a good faith lender; and (2) the League's by-laws require that it satisfy the financial obligations of the Debtor and it should not be protected for what it is already obligated to do.

## DISCUSSION

■ Debtor seeks authority to secure financing from the League pursuant to § 364(d)(1) which provides as follows:

(d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien of property of the estate that is subject to a lien only if—

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1). However, as the above factual recitation makes clear, the Debtor is not really seeking financing but rather is asking this Court to recharacterize the payments the League has made to third parties on its behalf as a secured loan. Thus, the first, and in my view insurmountable hurdle for the League to overcome, is to prove that these payments were intended as loans made to the Debtor rather than voluntary payments made in their own self interest which incidentally also benefitted the Debtor. Other than the payroll that was advanced against the Debtor's checks endorsed to the League, the record is silent as to any knowledge by the Debtor that the League was paying the bills. As no representative of the Debtor testified in support of the Motion, as far as I can tell the transactions were unilateral with the League picking and choosing what creditors to pay and when. The only evidence that the Debtor had requested the League to extend credit is the letter dated August 25, 2000 where

---

9. The League payments at issue here, however, were funded by a loan of $150,000 made on September 14, 2000 by the Long Island Ducks, a member team, and not the reserve account.

$200,000 is sought to fund the balance of the season. Exhibit D–12. Whether the Debtor ever got an answer to the request is unknown. However, the League's continued practice of paying the bills directly and its refusal to extend a loan to the Debtor for the emergency payroll on August 15, expressly stating its election to make loans directly to the players, are strong evidence that no loan was ever promised or implemented.

In short, I find that the Motion seeks more than retroactive court approval of a loan. Rather it seeks to allow the Debtor to recharacterize as its loan, the League's loans to third parties (the players) and voluntary payments of the Debtor's creditors. Significantly, I could find no reported case authorizing post-petition financing retroactively where the advances were not intended as a loan when made. Rather these cases evidence loans made to debtors for which the parties failed to secure prior court approval. Under the circumstances of this case, it is doubtful that § 364 is even applicable.

 However, assuming that the transactions could be characterized as a loan to the Debtor, the Bankruptcy Code is quite clear that a debtor must seek court approval to obtain credit. 11 U.S.C. § 364. This is particularly so where the lender seeks a senior or equal lien on property of the estate. *In re City Wide Press, Inc.*, 110 B.R. 710, 711 (E.D.Pa. 1990) (because power to authorize a lien under § 364(d) is "extraordinary, due process consisting of notice, hearing and court authorization is required.") *See also In re Braniff International Airlines*, 164 B.R. 820, 828 (Bankr.E.D.N.Y.1994). One who extends credit to a debtor without court authorization therefore does so at its own risk.[10] Accordingly, it is not surprising that the granting of *nunc pro tunc* authorization is an extraordinary remedy as it undercuts the policy and purpose of prior approval.[11] *In re City Wide Press, Inc.*, 102 B.R. 431, 436 (Bankr.E.D.Pa.1989) ("*nunc pro tunc* approval of any matter, including a § 364 application, is reserved for extraordinary circumstances in the Third Circuit"),[12] *aff'd*, 110 B.R. 710 (E.D.Pa.1990).

The concept of *nunc pro tunc* approval of post-petition financing has its case law origins in a 60–year old decision of the Second Circuit. In *American Cooler*, the Court reversed an order denying such approval and remanded for reconsideration of the request employing a newly fashioned test:

We think that the judge should not retroactively validate the loan unless he is confident that he would have authorized it if a timely application had been made,

10. In an oft repeated quotation, the Second Circuit Court of Appeals in setting forth the criteria for granting *nunc pro tunc* authorization of post-petition financing, observed:

We should emphasize that this equitable power must be cautiously exercised, and that only a foolhardy lender will attempt to make it serve as a substitute for proper authorization.

*In re American Cooler Co.*, 125 F.2d 496, 497 (2d Cir.1942). *See In re Photo Promotion Associates, Inc.*, 881 F.2d 6, 9 (2d Cir.1989).

11. Most of the courts that have considered the issue have concluded that the bankruptcy

court has the power to approve post-petition financing under § 364 on a retroactive basis. The issue is therefore when it is appropriate to do so.

12. The court found support for that conclusion, as do I, in the Third Circuit's decisions in *In re F/S Airlease II v. Simon*, 844 F.2d 99, 105–08 (3d Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 110 (1988), and *In re Arkansas Co.*, 798 F.2d 645, 648–51 (3d Cir.1986) dealing with *nunc pro tunc* approval of the retention of professionals under § 327.

and unless, in addition, he is reasonably persuaded that the creditors have not been harmed by a continuation of the business made possible by the loan. He should also take into account, as bearing on the good faith of the debtor and lender, whether or not they honestly believed that they had authority to enter into the transaction.

125 F.2d at 497.

■ *American Cooler* is obviously a case decided under the superceded Bankruptcy Act. The Act is relatively unclear as to the procedural requirements for credit acquisitions with such protections as they were being judge made. *City Wide Press*, 102 B.R. at 436. Because the present statutory iteration of the post-petition financing provision expressly imposes the prior authorization procedure, it has been viewed as requiring a higher threshold for *nunc pro tunc* approval. *See e.g., id.; General Electric Capital Corp. v. Hoerner (In the Matter of Grand Valley Sport & Marine, Inc.),* 143 B.R. 840, 851 (Bankr. W.D.Mich.1992).[13] From this conclusion, a test has been articulated, which I adopt herein, which begins with the *American Cooler* three prong criteria but adds the requirement that "there be something

more compelling in the nature of equities and absence of prejudice to interested parties to allow such an extraordinary dispensation." *City Wide Press, supra; Grand Valley Sport, supra. See also Braniff,* 164 B.R. at 829 (*American Cooler* factors continue "at minimum" to dictate the propriety of retroactive approval for unauthorized financing).

Assuming for the purpose of applying the *American Cooler* test that the payments made to Debtor's creditors were in the nature of a loan, I cannot conclude that retroactive authorization is warranted even on the threshold criteria of that case. The first inquiry is whether the credit would have been authorized if the application was timely made. As indicated by my colloquy with counsel at the August 15 hearing, it is likely that I would have authorized loans necessary to pay contemporaneous expenses to complete the season. However, once the season was concluded, I would have not authorized the debtor to borrow money on a secured basis to pay selected administrative expenses.[14] To do so would have elevated claims that were, in the hands of the original creditors, at best administrative expenses[15] to secured sta-

13. While most of the cases discussing the *American Cooler* precedent are reluctant to totally reject it, the consensus is that its authority is diminished by the change in the statute. However, at least one court has found no authority to approve § 364 motions on a *nunc pro tunc* basis finding that the procedures to access financing on an emergency basis in the Bankruptcy Code obviate the rationale for and necessity of retroactive validation. *Bezanson v. Indian Head National Bank et al., (In re J.L. Graphics),* 62 B.R. 750, 755 (Bankr.D.N.H.1986), *aff'd,* 818 F.2d 1027 (1st Cir.1987). *See also In the Matter of Garofalo's Finer Foods, Inc.,* 186 B.R. 414, 431 n. 10 (N.D.Ill.1995) (dicta).

14. Indeed the extant financing order allowed up to $500,000 of secured financing of which only $355,000 had been drawn. However,

that financing was for the express purpose of funding current operations. It would have not been within the contemplated use of the funds to satisfy unpaid bills after the season was concluded.

15. To be accorded administrative claim status, the payment would have had to have been an actual, necessary cost and expense of preserving the estate. 11 U.S.C. § 503(b)(1)(A). Based on the testimony relating to these payments, it appears that certain of these payments would not qualify. Moreover, by being paid before confirmation, the claims, even if accorded administrative expense status, have obtained preferential treatment over other administrative claims that are entitled to be paid *pari passu* and potentially Chapter 7 administrative claims that have priority under § 726(a). *In re Lodge America, Inc.,* 239 B.R.

tus to the detriment of existing secured creditors.[16] Moreover, I would not have authorized a borrowing that paid only net payroll.

The Committee contends as to the second prong, that creditors were harmed by the continuation of the business. In hindsight that may be true but only because the Debtor has been unable to find a buyer for the League membership. Even so, I can find no direct harm to creditors because the Debtor's only asset is the membership and it has not deteriorated in value by completing the season. While the unpaid administrative claims grew, the only way that *any* claims will be paid in this case, short of selling the membership, is by a judgment against the League on the Committee's theory that the League is responsible for all the Debtor's operating costs. If that judgment is not secured, then no claims will be paid and the amount of the claims will be irrelevant. Moreover, the completion of the season was expressly contemplated and court authorized financing was in place for that purpose. The second factor therefore favors retroactive authorization but again only to the extent the funds were used to complete the season which the record indicates only represents a portion of the advances.

Finally, the lender must have believed that the transaction it engaged in was proper. The League cannot withstand scrutiny under this criterion. The League actively participated in this reorganization case and knew the requisite procedure for lending to a debtor-in-possession. It was a party in interest in the New Horizons § 364 motion. It was specifically advised by the Court that if it would fund the Debtor's payroll shortfall, a court order would issue so it would be protected for the advance. It chose to go another route. The League cannot have it both ways. If it wanted to maintain its position as to the Debtor's monetary default by making loans directly to the players, it is stuck with that strategy. Having rejected the protection available to it to gain some inarticulated benefit, it cannot now seek it after the fact.

The Committee also argues that the League was obligated to make these creditor payments and should not be able to charge them back to the Debtor. I find that it is not necessary to decide whether the League is obligated to fund all the operating expenses of the Debtor in this context. It is sufficient to find that the League for its own purposes and benefit

---

580, 584 (Bankr.D.Kan.1999), *aff'd*, 259 B.R. 728 (D.Kan.2001). However, a determination of the status of the creditor claims is no longer relevant since they have all been paid by the League, and it is the League's claim that is at issue.

**16.** An objection to the Motion was filed by Eugene Mayer and Benjamin Miller, two of the participants in the New Life Horizons secured post-petition loan approved by the Court. Doc. No. 320. While they did not participate in the hearing on the Motion, their pleading argues that the League made its advances with knowledge of their prior claims, and it should not be permitted to prime their existing liens without proof that the value of the Debtor's assets is sufficient to protect

them. While the Motion does seek a lien prior to all other liens, it is not clear to me that the League continues to seek that extraordinary relief. In any event, even granting an equal lien to the League arguably would impair the position of the existing New Life Horizons secured creditors and require proof that they are adequately protected. Had the Debtor actually secured a loan from the League to *contemporaneously* fund the season completion expenses, it is likely that I would have granted it on an equal basis to the existing secured creditors who had made loans with the expectation that $500,000 of secured credit would be treated *pari passu*. What I would have ruled on the priming would have depended on the record made, and none was.

did so as it had done so in the past. Given its insistence that the Black Diamonds play this season, it is not surprising that it stepped up to the plate to remedy the creditor problems. League representatives have been clear that the Debtor's creditor problems were League problems. Accordingly, for the League to take it upon itself to voluntarily pay the outstanding bills of the season, including those of its member teams and its dues and then seek secured loan status in this bankruptcy is inconsistent with the third factor which looks to the good faith of the transaction.

Needless to say, having found the *American Cooler* test unsatisfied, I need not determine whether the request meets the higher standard required under § 364(d) of the Code. For all the foregoing reasons, the Motion is denied. An Order consistent with this Memorandum Opinion shall issue.

### ORDER

**AND NOW,** this 28th day of March 2001, in consideration of the Debtor's Motion for Authority to Obtain Secured Post–Petition Financing Pursuant to 11 U.S.C. § 364(d) (the "Motion"), and after notice and hearing on the Motion, and for the reasons set forth in the accompanying Memorandum Opinion;

It is hereby **ORDERED** that the Motion is **DENIED.**